EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF MONROE

STEPHANIE WOODWARD,

                                            Plaintiff,

                    -against-

THE CITY OF ROCHESTER, a municipal entity,
RICHARD ARROWOOD, ERIC SCHIFFMAN,
STEPHANIE BURGSTROM, "JOHN DOE POLICE
OFFICERS 1-200" (names and number of whom are
unknown at present), TODD BAXTER, "RICHARD ROE
SHERIFF'S DEPUTIES 1-200" (names and number of
whom are unknown at present), and other unidentified
members of the Rochester Police Department and Monroe
County Sheriff's Office,

                                            Defendants.

INDEX NO.:

**VERIFIED COMPLAINT
[JURY TRIAL DEMANDED]**

**To the above named Defendants:**

**You are hereby summoned** to answer the complaint in this action, and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance on the Plaintiff's attorneys within twenty days after the service of this summons, exclusive of the day of service, where service is made by delivery upon you personally within the state, or, within 30 days after completion of service where service is made in any other manner. In case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

DATED: New York, New York
            September 1, 2021

                    Yours, etc.,

                    ROTH & ROTH, LLP.
                    ELLIOT SHIELDS, ESQ.
                    Attorney for Plaintiff
                    192 Lexington Ave, Suite 802
                    New York, New York 10016
                    (212) 245-1020

                    EASTON THOMPSON
                    KASPEREK SHIFFRIN LLP
                    Donald Thompson

1

INDEX NO. E2021008146

RECEIVED NYSCEF: 09/01/2021

16 West Main Street, Suite 243
Rochester, New York 14614
Ph: (585) 423-8290

TO:
CITY OF ROCHESTER
CORPORATION COUNSEL
30 Church Street
Rochester, New York 14614

COUNTY OF MONROE
Monroe County Law Department
307 County Office Building
39 W. Main St.
Rochester, NY 14614

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF MONROE

STEPHANIE WOODWARD,

Plaintiff,

-against-

THE CITY OF ROCHESTER, a municipal entity, RICHARD ARROWOOD, STEPHANIE BURGSTROM, ERIC SCHIFFMAN, "JOHN DOE POLICE OFFICERS 1-200" (names and number of whom are unknown at present), TODD BAXTER, "RICHARD ROE SHERIFF'S DEPUTIES 1-200" (names and number of whom are unknown at present), and other unidentified members of the Rochester Police Department and Monroe County Sheriff's Office,

Defendants.

INDEX NO.:

**VERIFIED COMPLAINT**
**[JURY TRIAL DEMANDED]**

Plaintiff, by her attorneys, ROTH & ROTH, LLP and EASTON THOMPSON KASPAREK SHIFFRIN LLP, complaining of the defendants, respectfully allege as follows:

## I.    PRELIMINARY STATEMENT

1.    This is a civil rights action seeking damages and injunctive relief from Defendants, the City of Rochester ("CITY") and the John Doe Rochester Police Department ("RPD") officers, for Defendants' violations of Plaintiff Stephanie Woodward's civil rights on September 16, 2020 under the Federal Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act, ("Section 504"), the New York State Human Rights Law, N.Y. Exec. Law § 290 *et. seq.* ("NYSHRL"), and pursuant to 42 U.S.C. § 1983 ("Section 1983").

2.    Plaintiff STEPHANIE WOODWARD is 33 years old. She is a person with a disability. Ms. WOODWARD is paralyzed from the waist area down. She cannot walk and exclusively uses a wheelchair for mobility. Ms. WOODWARD requires frequent use and access to the bathroom.

3

3.      On September 16, 2020, while she was attending a peaceful protest in front of City Hall, RPD officers arrested and detained Ms. WOODWARD in a discriminatory and inaccessible way that failed to accommodate Ms. WOODWARD's disability, caused her injury and humiliation, and violated her rights.

4.      Following her arrest, the RPD officers could not transport Ms. WOODWARD to the Public Safety Building ("PSB") for arrest processing—as they did with all other protesters who were arrested who were not wheelchair users—because the RPD does not own or have access to any wheelchair-accessible transport vehicles.

5.      All other protesters who were arrested on September 16, 2020 were transported to the PSB for booking and arrest processing. All other protesters had access to bathrooms at the PSB.

6.      Because the RPD lacks wheelchair accessible transportation vehicles, Ms. WOODWARD was detained on the street where she was arrested, for over two hours. Ms. WOODWARD repeatedly requested that RPD officers permit her to use the bathroom, but her requests were ignored. As a result, Ms. WOODWARD urinated on herself.

7.      Today, more than 30 years after the passage of the Americans with Disabilities Act, the City of Rochester still fails to provide accessible transportation vehicles when a person who uses a wheelchair is arrested, detained, or transported by RPD personnel. The City of Rochester also fails to offer adequate training, policies, and procedures to govern situations where a person who uses a wheelchair is arrested and must be transported. When it arrested and detained Ms. WOODWARD for several hours on September 16, 2020, the RPD used discriminatory, inaccessible, and degrading methods. As a result, Ms. WOODWARD experienced discrimination, humiliation, and indignity. By refusing to provide accessible

4

services, the RPD discriminated against Ms. WOODWARD, adding an additional layer of punishment, injury, and indignity to the arrest and detention process, solely because of Ms. WOODWARD's disability.

8.     Ms. WOODWARD also brings this action for compensatory damages, punitive damages, and attorney's fees pursuant to New York State law and 42 U.S.C. §§ 1983 and 1988 for damages she sustained from being attacked by RPD officers and Sheriff's Deputies with chemical weapons on September 5-6, 2020.

9.     On September 5, 2020, Ms. WOODWARD attended a protest to call for justice for Daniel Prude, to mourn the loss of Black lives, demand the City finally end its racist and brutal policing practices, and call for new visions of public safety that value Black lives.

10.     In response, RPD officers and Sheriff's Deputies "kettled" hundreds of protesters at the intersection of Broad Street and Exchange Blvd., including Ms. WOODWARD, attacked them with tear gas, sprayed them with pepper spray, and attacked them with pepper balls.

11.     Chemical weapons, like tear gas, are banned in warfare because they are indiscriminate weapons by design, especially when deployed by firing a grenade or canister. Chemical weapons can cause severe injury or death, and, even at low concentrations, exposure to tear gas presents a risk of serious, irreversible health effects.

12.     For Ms. WOODWARD, exposure to chemical weapons on September 5-6, 2020 has caused infertility.

## II.     PARTIES

13.     Plaintiff STEPHANIE WOODWARD is a Citizen of the United States and is a qualified individual with a disability under federal law. She is a resident of the Town of Greece, State of New York. She works at the Empire Justice Center in downtown Rochester, and travels into the City of Rochester on a nearly daily basis.

5

14.     Defendant CITY OF ROCHESTER ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the RPD.

15.     Defendant CITY OF ROCHESTER ("CITY") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York. Defendant CITY maintains the City of Rochester Police Department, a duly authorized police department, authorized to perform all functions of a police department. RPD acts as Defendant CITY's agent and Defendant CITY assumes the risks incidental to the maintenance of a police department and the employment of police officers. The CITY and RPD received federal financial assistance at all times relevant to this Complaint.

16.     RICHARD ARROWOOD ("ARROWOOD"), ERIC SCHIFFMAN ("SCHIFFMAN"), STEPHANIE BURGSTROM ("BURGSTROM") and "JOHN DOE" ROCHESTER POLICE DEPARTMENT OFFICERS 1–200 (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Police Officers with the RPD. At all relevant times, these defendants were acting within the scope of their employment with the CITY and RPD and under color of state law. They are sued in their individual capacities. John Doe RPD Officers are referred to collectively as "the RPD officers."

17.     Defendant TODD BAXTER ("Sheriff Baxter" or "BAXTER") was, at all times relevant herein, the duly elected Sheriff of the County of Monroe. At all relevant times,

6

Defendant BAXTER was acting within the scope of his employment and under color of state law. He is sued in his individual and official capacity.

18.     "RICHARD ROE" MONROE COUNTY SHERIFF'S DEPUTIES 1–200 (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Deputy Sheriffs with the Monroe County Sheriff's Office ("MCSO"). At all relevant times, these defendants were acting within the scope of their employment with the County and under Sheriff BAXTER and acting under color of state law. They are sued in their individual capacities. They are referred to collectively as "the Sheriff's Deputies."

19.     BAXTER is responsible for the training, supervision and discipline of the Defendant Sheriff's Deputies under state law.

## II. JURISDICTION AND CONDITIONS PRECEDENT

20.     This action falls within one or more of the exceptions as set forth in CPLR Section 1602, involving intentional actions, as well as the defendant, and/or defendants, having acted in reckless disregard for the safety of others, as well as having performed intentional acts.

21.     Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

22.     Ms. WOODWARD filed a timely Notice of Claim against the City in compliance with the Municipal Law § 50.

23.     The CITY held a 50-h hearing for Ms. WOODWARD on May 17, 2021; the County waived its right to hold a 50-h hearing.

24.     More than thirty (30) days have elapsed since service of said Notice of Claim was filed and the City and County have failed to pay or adjust the claim.

7

25.     This action is being brought within a year and 90 days of the event that gives rise

to Ms. WOODWARD'S causes of action under New York State law and Plaintiff has complied

with all of the statutory prerequisites for bringing this action.

### III. JURY TRIAL DEMAND

26.     Plaintiff demands a trial by jury on each and every claim to which they are legally

entitled to a jury.

### IV. FACTUAL ALLEGATIONS

#### A. Ms. Woodward's Disability

27.     Ms. Woodward has a visible physical disability.

28.     Ms. Woodward is paralyzed from the waist area down, cannot walk, and requires

a wheelchair for mobility.

29.     On September 5-6 and 16, 2020, at the locations hereinafter mentioned and at all

times herein, Ms. WOODWARD was confined to a wheelchair.

30.     Ms. WOODWARD also has limited bladder function as a result of her paralysis.

31.     Ms. WOODWARD is a qualified individual with a disability, as defined by the

ADA, 42 U.S.C. § 12102, and Section 504, 29 U.S.C.A. § 794(a). She also has a disability as

defined by N.Y. Exec. Law § 292 (21), the NYSHRL.

32.     Upon information and belief, all officers responsible for Ms. WOODWARD's

arrest, detention, and transportation, including SCHIFFMAN, were aware of Ms.

WOODWARD's visible physical disability.

#### B. Facts Common to All Causes of Action.

33.     On March 23, 2020, Daniel Prude's family sought help from the Rochester Police

Department ("RPD") as Daniel was suffering an acute mental health crisis. Tragically, that call

8

for help ended with Daniel naked and handcuffed with his face covered by a "spit hood," as an RPD officer pushed his head into the freezing asphalt for several minutes. RPD officers on the scene mocked Daniel and chatted with each other while he asphyxiated. Daniel was declared brain dead that night; he was taken off life support and died on March 30.

34.     When the video of RPD Officers killing Daniel Prude was finally made public on September 2, 2020, it sparked nationwide outrage. In Rochester, thousands of people gathered to mourn the loss of Black lives, demand the CITY finally end its racist and brutal policing practices, and call for new visions of public safety that value Black lives.

35.     On September 2-6, 2020, the RPD and MCSO defendants responded to peaceful protests with extreme violence—including the indiscriminate use of tear gas and pepper spray, 40 millimeter blunt-impact projectiles, thousands of pepper balls, flash-bang grenades and other supposedly "less-than-lethal" munitions. Peaceful protests continued in the months after these initial nights, including a peaceful protest on September 15-16, 2020.

36.     Ms. WOODWARD attended protests on the night of Saturday September 5-6, 2020 and the morning of September 16, 2020, which form the basis for her claims in this lawsuit.

### C. Defendants attack Ms. Woodward with Chemical Weapons on Saturday, September 5, 2020 to Sunday September 6, 2020.

37.     Like they did on prior nights after the video of RPD officers killing Daniel Prude was released, on the night of Saturday September 5-6, 2020, RPD officers and Sheriff's deputies used military grade weapons to attack peaceful protesters in downtown Rochester. RPD officers and Sheriff's deputies trapped peaceful protesters—including Ms. WOODWARD—at the intersection of Broad Street and Exchange Boulevard, and almost immediately began attacking them. RPD officers and Sheriff's deputies began to launch flash bang grenades, release tear gas, and shoot pepper balls into the crowd indiscriminately.

9

NYSCEF DOC. NO. 1

CASE NO. E2021008146

RECEIVED NYSCEF: 09/01/2021

38.     Ms. WOODWARD marched with the crowd until police kettled them at the intersection of Broad and Exchange. Ms. WOODWARD and the other peaceful protesters sang and chanted.

39.     RPD officers issued dispersal orders, knowing that it was physically impossible for Ms. WOODWARD and the other protesters to immediately comply with the orders.

40.     Suddenly, at approximately 10:30 p.m., without warning, cause, or justification, RPD officers and Sheriff's Deputies attacked Ms. WOODWARD and the other protesters with chemical weapons, flash bang grenades and other "less lethal" weapons.

41.     A RPD officer or Sheriff's Deputy threw a tear gas cannister at Ms. WOODWARD, which went off when it was underneath her wheelchair and engulfed her in tear gas.

42.     When Ms. WOODWARD was finally able to turn her wheelchair around, the crowd had dispersed behind her.

43.     Ms. WOODWARD began to retreat north on Exchange towards Main Street. While her back was to the barricades, one or more RPD officers and/or Sheriff's Deputies, shot Ms. WOODWARD in the back with pepper balls and/or other projectiles. At least one pepper ball hit Ms. WOODWARD in the back of her right shoulder.

44.     This was a violation of RPD policy, which prohibits shooting pepper balls at a subject's upper body.

45.     When Ms. WOODWARD was shot in the back, there was no one else near her other than her husband (who is also a wheelchair user); thus, it is clear that the RPD officers and/or Sheriff's Deputies intended to shoot them in the back as they wheeled away from law enforcement.

10

46.     It was objectively unreasonable for the RPD officers and/or Sheriff's Deputies to shoot Ms. WOODWARD in the back as she was retreating from law enforcement.

47.     At no time did Ms. WOODWARD commit any crime or violation.

48.     At no time did Ms. WOODWARD threaten police in any way.

49.     The RPD Officers lacked cause or any justification to or use "chemical weapons" or any physical force against Ms. WOODWARD.

50.     Any no time did Defendants make an individualized determination that they had cause or legal justification to use force against Ms. WOODWARD; instead, the use of force was based on perceived "group conduct."

51.     As a result of the chemical weapons Defendants used against her on September 5-6, 2020, Ms. WOODWARD sustained irritation to her skin, eyes, mouth, nose and lungs and menstrual irregularities.

52.     As a result of the chemical weapons Defendants used against her on September 5-6, 2020, Ms. WOODWARD has been unable to become pregnant, despite trying for one year.

53.     As a result of being shot in the back of her right shoulder with a projectile by Defendants on September 5-6, 2020, Ms. WOODWARD sustained a shoulder injury that impeded her ability to independently propel her wheelchair.

54.     Ms. WOODWARD also sustained physical pain and emotional and psychological harm from being attacked by the RPD officers and Sheriff's Deputies.

D.     **Negligence of the City And RPD in Failing to Properly Train RPD Officers and On The Proper Handling of First Amendment Assemblies, and In Failing to Supervise and Discipline Officers Who Used Excessive Force Against Protesters.**

11

NYSCEF DOC. NO. 1

55. The violation of Ms. WOODWARD's rights is attributable to the CITY and RPD's disregard of many years of notice, criticism, and other relevant data points, both internal and external, related to its unconstitutional policing of similar protests.

56. Based on statements by City Officials and RPD command staff to date, no RPD officer has reported any fellow officer for their unlawful use of force and no RPD officers have been disciplined for their unlawful use of force on September 2, 3, 4 or 5, 2020.

57. Since at least the 2009, the RPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies.

58. Upon information and belief, the core training provided by the CITY related to protest response is based on crowd management and disorder control tactics for policing large-scale civil disorders and riots.

59. According to the CITY's website, the RPD's Mobile Field Force (MFF) is a "specially trained and equipped team providing a rapid, organized and disciplined response to civil disorder [and] crowd control."

60. The MFF was the RPD's primary unit tasked with policing the peaceful protests in the wake of George Floyd and Daniel Prude in May and September 2020, respectively, and on the nights of September 4-5 and 5-6, 2020 specifically.

61. Upon information and belief, the MFF's training and guidelines treat peaceful protest and peaceful demonstrations as military engagements and copies military tactics and focus on tactics designed to deter, disperse, and demoralize groups, such as disorder control formations and mass use of chemical weapons.

62. Such disperse and demoralize tactics have persisted through the present as exemplified by the experiences of Plaintiffs.

12

63.     Upon information and belief, the MFF's "civil disorder" training and guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as peaceful protests—only for large-scale civil disorders such as riots.

64.     However, neither the MFF's "civil disorder" training and guidelines, nor, upon information and belief, any related RPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies, such as peaceful protests and lawful demonstrations.

65.     For example, upon information and belief, there is virtually no RPD training—and certainly no meaningful RPD training—focusing on how to utilize the tactics described in the MFF's "civil disorder" training and guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

66.     Many MFF members have histories of engaging in the kinds of misconduct complained of herein, among other places, by CRB complaints, PSS investigations and in lawsuits.

67.     Examples of the RPD's unreasonable and discriminatory use of force at prior lawful protests include:

- In October 2009, an anti-war protest in Rochester resulted in several physical confrontations, with two protesters receiving stitches at the hospital after RPD officers pushed them face-first to the ground, and 12 protesters arrested for exercising their First Amendment rights. The peaceful march, held in the early evening, was interrupted by approximately forty RPD vehicles. Within three minutes of giving the order to disperse,

13

NYSCEF DOC. NO. 1

RPD officers began to shove and hit protesters with clubs and deploy pepper spray. Protesters described RPD officers wading through the crowd to pick out Black students to arrest. A press videographer who was filming one such arrest was wrestled to the ground by police and himself arrested.

- In May 2015, Katrina Perkins was protesting police brutality on a public street in a residential neighborhood, where two of her daughters and six of her grandchildren reside. Though Ms. Perkins was peacefully demonstrating, RPD officers violently seized and arrested her and then charged her with disorderly conduct and disruption. Those charges were dismissed two months later. Police brutality is a deeply personal issue to Ms. Perkins, as her daughter Lashedica was the 13-year-old shot three times by former-Deputy Chief Simmons in 2005.

- In July 2016, in Rochester as across the nation, people took to the streets to uphold the sanctity of Black lives and call for an end to racist policing. In response, the RPD deployed, beat, shoved, and pepper sprayed protesters. As one described it: "I started to turn and they tackled me to the ground....They're beating citizens for no reason whatsoever. I wasn't doing anything. I was taking pictures." RPD officers, in keeping with their pattern and practice, particularly targeted Black protesters with unlawful force, including Black journalists: Carlet Cleare and Justin Carter of WHAM-TV were both handcuffed and detained, even though Ms. Cleare was wearing a WHAM-TV shirt and they identified themselves as members of the press. Over the course of one weekend, Rochester had more arrests at its BLM protest (74) than the rest of the nation combined.

14

68.     Despite the wealth of evidence of RPD members' historical brutality against protesters, Defendant City has ignored, and/or failed to utilize, relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in RPD training as it relates to constitutionally compliant protest policing.

69.     In fact, following the 2016 protest, the RPD and Mayor Lovely Warren's office stated the police handled themselves appropriately.

70.     When questioned by public officials after the September 2020 protests, former RPD Chief La'Ron Singletary stated that he did not review the RPD's actions at the 2016 protest in developing the RPD's strategy for responding to protests in 2020.

71.     Moreover, between a protest that occurred on May 30, 2020 and the September 2020 protests, the RPD quietly updated its departmental policy on usage of the PepperBall Launching System ("PLS"). Specifically, the Department amended the policy to allow officers on the patrol division to use the PLS. Prior to this amendment, only officers on the Special Weapons and Tactics ("SWAT") team were eligible to use PLS. The RPD did not update the policy in any other way.

72.     Under RPD General Order 630, an officer is ineligible to join the SWAT team if he has "any instance of sustained excessive force" or "serious" misconduct in his disciplinary history. The Patrol Division (or Mobile Field Force team) does not have any such eligibility requirement.

73.     On information and belief, the Department updated this policy to ensure more officers could (and would) be able to use the PLS in anticipation of protests after the suppressed footage of RPD officers killing Daniel Prude was released. By removing any "disciplinary

15

history check," the Department knew or had reason to know that RPD officers would use

excessive force when engaging with protesters—which they did.

74. On information and belief, the CITY and the RPD failed to provide any training

to RPD officers on how to use the PLS.

75. Any training the CITY and the RPD provided to RPD officers on using the PLS

was insufficient and inadequate.

76. In summary, upon information and belief, the RPD's exclusive focus on deterring,

dispersing, and demoralizing in trainings related to policing peaceful protests, coupled with the

failure to train on specific, relevant aspects of constitutional policing of peaceful protests, let

alone how to encourage or facilitate protests—despite having received clear notice that RPD

policing of said protests has caused the systemic violations of protesters' constitutional rights for

years—demonstrates the City's negligence in failing to train and supervise RPD Officers in

properly and lawfully policing protests to ensure that protesters' rights under the First

Amendment, Fourth Amendment, Fourteenth Amendment, and other, related rights are not

violated. As a result of the City's negligence, Plaintiff was injured and harmed, as described

herein.

E. **Negligence of Sheriff BAXTER in Failing to Properly Train Sheriff's Deputies On The Proper Handling of First Amendment Assemblies, and In Failing to Supervise and Discipline Sheriff's Deputies Who Used Excessive Force Against Protesters**.

77. Similarly, prior to September 2020, BAXTER had received clear notice that

peaceful protests and lawful demonstrations have occurred and will continue to occur in Monroe

County, and that without proper training, his Deputy Sheriffs would violate individuals'

constitutional rights and endanger the life and safety of protesters, such as Plaintiff.

16

78.     BAXTER has deliberately disregarded the fact that peaceful protests and peaceful demonstrations have occurred and will continue to occur in Monroe County, and instead has trained his Deputies that such lawful First Amendment activities constitute "civil disturbances" that mut be policed in the same manner as "violent mobs" or "riots."

79.     BAXTER, upon information and belief, took no steps to train his Sheriff's Deputies on lawfully policing protests and other First Amendment activities.

80.     Instead, BAXTER, pursuant to the County's Hazard Mitigation Plan, trains his Sheriff's Deputies that a "civil disturbance" is defined as both "peaceful demonstrations or acts of violence."

81.     Upon information and belief, BAXTER is responsible for implementing the Hazard Mitigation Plan, and trains his Sheriff's Deputies in accordance with its mandates. Thus, BAXTER explicitly conflates peaceful protests and peaceful demonstration with violent riots.

82.     Upon information and belief, BAXTER does not provide any training to Sheriff's Deputies on drawing a meaningful distinction between "peaceful demonstrations" and "violent mobs". For example, in its "Hazard Mitigation Plan," the County states that, "Many civil unrest incidents are spontaneous and can occur at any time, rendering prediction of probability of future occurrences difficult. When these incidents occur, they can become extremely disruptive and difficult to control. Assumedly, civil unrest incidents including marches, protests, demonstrations, and gatherings will continue to occur throughout Monroe County."

83.     According to the Hazard Mitigation Plan, peaceful demonstrates are discouraged because of the perceived negative impacts on property resources, real estate and the economy; again, this is a result of BAXTER falsely conflating "peaceful demonstrations" and peaceful protests with "acts of violence."

17

84.  Upon information and belief, BAXTER does not provide any training to Sheriff's Deputies on how to encourage and support individuals engaging in "peaceful demonstrations" to ensure that their constitutional rights are not violated by law enforcement officers.

85.  Upon information and belief, BAXTER does not provide any training to Sheriff's Deputies on making a meaningful distinction between how Sheriff's Deputies are trained and instructed on policing "peaceful demonstrations", "peaceful protests" versus "violent mobs" and riots.

86.  Instead, the Hazard Mitigation Plan states that, "[m]any protests intended to be peaceful demonstrations to the public and the government can escalate into general chaos." Thus, upon information and belief, BAXTER trains his Sheriff's Deputies to police peaceful demonstrations in the same manner as they would a violent mob.

87.  Like the RPD, upon information and belief, BAXTER trains Sheriff's Deputies exclusively on deterring, dispersing, and demoralizing protests and peaceful demonstrations.

88.  In June 2020, several Monroe County Legislators called on BAXTER to implement new protest training to ensure the safety of protesters at Black Lives Matter demonstrations. The legislators drafted a letter to County Executive Adam Bello and BAXTER in which they made a number of requests related to public safety and the safety of protesters, and closed by stating, "Once again, we believe the safety of both protesters, motorists, and law enforcement is of the utmost importance. Right here in Monroe County and across the Nation, we have seen the negative results when leaders are reactionary rather than proactive. Please be sure that a plan is in place to ensure the mutual safety of all involved."

18

89.    BAXTER claimed the letter was a "political stunt" and refused to provide any specific details regarding how Sheriff's Deputies would ensure the safety of protesters during peaceful demonstrations.

90.    As a result of the BAXTER's negligence, Plaintiff was injured and harmed, as described herein.

### F. Ms. WOODWARD's September 16, 2020 Arrest.

91.    On the night of September 15-16, 2020, Free the People ROC organized a peaceful "sleep-in" protest in front of City Hall. In the morning, protesters awoke to police getting into formation and issuing dispersal orders.

92.    Ms. WOODWARD did not attend the "sleep-in", but went to the protest in the morning at approximately 9:00 a.m.

93.    When Ms. WOODWARD arrived, the police had formed a line and were facing off with protesters on Church Street in front of City Hall.

94.    Ms. WOODWARD joined the line of protesters on the edge of the street in the bike lane.

95.    Approximately five minutes after Ms. WOODWARD arrived, five RPD officers, including SCHIFFMAN, ARROWOOD and BURGSTROM seized and arrested her:

19



96.     The RPD officers pushed Ms. WOODWARD's wheelchair to the corner of Church Street and Fitzhugh Street, and detained her on the street corner.

97.     SCHIFFMAN was assigned to detain Ms. WOODWARD.

98.     SCHIFFMAN, ARROWOOD and BURGSTROM and other officers called their supervisors and informed them that they did not know how to transport Ms. WOODWARD to PSB, and that they were not expecting to arrest a wheelchair user.

99.     Ms. WOODWARD immediately informed SCHIFFMAN, ARROWOOD, BURGSTROM and other RPD officers that she would eventually have to urinate, and that part of her disability is that she is unable to hold it for long periods of time. Thus, when she felt the urge to urinate, she would have to go immediately, or she would urinate on herself.

100.    SCHIFFMAN, ARROWOOD, BURGSTROM and other officers discussed the possibility of lifting Ms. WOODWARD out of her wheelchair and placing her into a regular transport vehicle.

20

INDEX NO. E2021008146

RECEIVED NYSCEF: 09/01/2021

101.    The other protesters were that were arrested who do not use wheelchairs were all placed in Sheriff's Office transportation vans and transported to the PSB, where they were able to use the bathroom.

102.    Ms. WOODWARD was detained on the sidewalk at the corner of Church Street and Fitzhugh Street for approximately two hours.

103.    Throughout the two hours that she was detained on the sidewalk, Ms. WOODWARD repeatedly informed SCHIFFMAN, ARROWOOD, BURGSTROM and other RPD officers that she had to urinate, but they did not permit her to use the bathroom.

104.    As a result, Ms. WOODWARD urinated on herself.

105.    Eventually, Ms. WOODWARD was given an appearance ticket and told she could leave.

106.    RPD officers were unable to transport Ms. WOODWARD to the PSB, where she could have used the bathroom, because they do not have any wheelchair accessible vehicles. This constituted a failure to accommodate Ms. WOODWARD's disability.

107.    During her encounter with the RPD on September 16, 2020, Ms. WOODWARD repeatedly experienced discrimination, indignity, inaccessibility, and services that were not adequate to accommodate, protect, or ensure the safety of a person who uses a wheelchair.

### G. The RPD has a Pattern and Practice of Failing to Accommodate Arrestees or Detainees Who Use Wheelchairs During Transports.

108.    The City of Rochester routinely fails to provide appropriate and accessible vehicles when a person who uses a wheelchair is arrested, detained, or transported by RPD personnel. The City also fails to offer adequate training and policies or procedures to govern situations where a person who uses a wheelchair is arrested and needs to be transported.

21

109. The City of Rochester does not have a written anti-discrimination policy concerning how RPD personnel are to appropriately interact with and accommodate people who use wheelchairs when they are arrested and need to be transported.

110. The City of Rochester does not have any wheelchair accessible vans within the fleet of vehicles the RPD uses to transport arrestees or detainees.

111. Accessible vans for wheelchair users have features such as very wide doors, ramps on a safe slope into the vehicle, barriers on the sides of the ramp to ensure stability, and devices to secure the person inside the van.

112. Publicly available information chronicles numerous instances of the RPD's unsafe interactions with people who use wheelchairs. These incidents demonstrate the City of Rochester's pervasive pattern and practice of providing physically inaccessible RPD services and facilities, as well as insufficient training and policies and procedures for RPD personnel.

113. For example, on May 1, 2013, RPD officers Joseph Ferrigno and Anthony Liberatore unlawfully ordered 52-year-old Benny Warr to disperse from the location where he was waiting for a public bus. Mr. Warr is a one-leg amputee and wheelchair user, and when he explained that he was waiting for the bus, they threw him out of his wheelchair, beat and arrested him. Upon information and belief, the RPD had Mr. Warr transported by ambulance because they lacked any wheelchair accessible transport vehicles.

114. Moreover, in *Warr*, the defendant police officers testified that they had no training on how to lawfully arrest a wheelchair user.

115. On June 28, 2017, Ms. WOODWARD and numerous other wheelchair users were arrested while protesting proposed cuts to Medicaid at the Monroe County Republican Office in downtown Rochester. Numerous RPD officers and former RPD Chief Michael Ciminelli arrived

22

at the arrest location and discussed how they had no way to transport the wheelchair users to the PSB for arrest processing. Ciminelli and Locust Club President Mike Mazzeo spent time negotiating the arrest procedure. Eventually, Chief Ciminelli decided that the wheelchair users would be taken next door to the Center for Disability Rights, where they were booked and issued appearance tickets. Upon information and belief, the reason that the protesters were not transported to the PSB for arrest processing is because approximately 10-15 wheelchair users were arrested and the RPD had no wheelchair accessible transport vehicles. Upon information and belief, if the group had not included wheelchair users, they would have been transported via RPD vehicles to the PSB for booking and processing.

116. Similarly, on September 4, 2020, at a Daniel Prude protest on the Court Street Bridge, RPD officers attacked a wheelchair user named Christopher Hilderbrant, threw him from his wheelchair to the ground, repeatedly struck him and then dragged him approximately 10 feet across the pavement. Mr. Hilderbrant was arrested; but like Ms. WOODWARD, because the RPD lacks wheelchair accessible vehicles, Mr. Hilderbrant was not placed in a transport vehicle. Instead, Mr. Hilderbrant was wheeled from the Court Street Bridge to PSB. After unlawfully detaining him for several hours, the RPD officers decided to let him go without charging him with a crime. Upon information and belief, the RPD officers released him without charging him with a crime solely because of his disability.

117. Numerous other protesters who are not wheelchair users were arrested on September 4, 2020 and transported to the PSB. Most of them, such as Masai Andrews, were loaded into transportation vehicles and driven to the PSB. Once at the PSB, those other protesters were charged with crimes by the RPD and given appearance tickets before being released, unlike Mr. Hilderbrant.

23

118.    Mr. Hilderbrant's arrest put the RPD on notice prior to the September 16, 2020 protest that wheelchair users were not only attending the Daniel Prude protests but were being arrested by the RPD and that the RPD needed to have wheelchair accessible transportation vehicles at protests.

119.    Upon information and belief, there are numerous other incidents in which the RPD's discriminatory conduct violated the protections afforded to people who use wheelchairs under the ADA, Section 504, other federal and state anti-discrimination laws, and the United States Constitution.

120.    These incidents, together with Ms. WOODWARD's encounter with the RPD on September 16, 2020, demonstrate that the RPD is not in compliance with federal and state law, routinely discriminates against people who use wheelchairs, and fails to provide accommodations for wheelchair users.

121.    The City of Rochester has failed to implement RPD training, practices, policies, and procedures that accommodate and ensure the safety of people who use wheelchairs when they encounter the RPD and require transport.

122.    However, despite this knowledge, the City of Rochester has failed to adopt training, policies, practices, and procedures sufficient to accommodate and safely arrest, transport and detain people who use wheelchairs in a way that accounts for their disabilities and is not discriminatory.

## V.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
### Municipal Liability

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's First, Fourth and Fourteenth Amendment Rights***

24

123.    All preceding and subsequent paragraphs are incorporated by reference.

124.    All of the wrongful acts or omissions complained of herein against Plaintiff and

other protesters were carried out by the individually named and unnamed RPD officers pursuant

to: (a) formal policies, rules, and procedures of Defendant CITY; (b) actions and decisions by

Defendant CITY's policymaking agents; (c) customs, practices, and usage of the RPD that are so

widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned,

ratified, sanctioned, and/or enforced by CITY policymaking officials; (d) Defendant CITY's

deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth

Amendments of the United States Constitution, as evidenced by the CITY's failures, and the

failures of the other policymaking agents, to train, supervise, and discipline RPD officers, despite

full knowledge of the their wrongful acts against Plaintiff and other protesters, as described

herein.

125.    Accordingly, Plaintiff was harmed as a direct result of Defendants' unlawful

conduct and is entitled to damages, injunctive relief, and reasonable attorney's fees and costs in

an amount to be determined by the Court.

## SECOND CLAIM FOR RELIEF
### Excessive Force
#### *Pursuant to 42 U.S.C. § 1983*

126.    All preceding and subsequent paragraphs are incorporated by reference.

127.    Defendants' actions towards Plaintiff on September 5-6, 2020 constitute excessive

force in violation of 4th and 14th Amendments of the United States Constitution and 42 U.S.C. §

1983.

25

128.    Defendants used force against Ms. WOODWARD that was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted them.

129.    It was objectively unreasonable for the RPD Officers and/or Sheriff's Deputies to use military grade weapons, "less-than-lethal" weapons, and chemical weapons against Ms. WOODWARD on September 5-6, 2020, without first having made an individualized determination that it was reasonable to use any force Ms. WOODWARD based on her own individual conduct, instead of any perceived "group conduct." This conduct constitutes a seizure under the 4th Amendment.

130.    It was objectively unreasonable for RPD officers and/or Sheriff's Deputies to shoot Ms. WOODWARD in the back of her shoulder as she was wheeling away from officers and attempting to disperse from the area.

131.    The types and levels of force Defendants used against Ms. WOODWARD were in contravention of, or inconsistent with, related policies and/or training.

132.    As a result of the acts and omissions of the RPD officers and/or Sheriff's Deputies, Defendants deprived Ms. WOODWARD of her federal, state, and/or other legal rights; caused Ms. WOODWARD bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Ms. WOODWARD to expend costs and expenses; has prevented Ms. WOODWARD from becoming pregnant; and/or otherwise damaged and injured Ms. WOODWARD.

133.    The actions of the RPD officers and Sheriff's Deputies were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

26

134.     Accordingly, Plaintiff was harmed as a direct result of Defendants' unlawful conduct and is entitled to damages, injunctive relief, and reasonable attorney's fees and costs in an amount to be determined by the Court.

### THIRD CLAIM FOR RELIEF
**Assault and Battery**
*Pursuant to New York State Law.*

135.     All preceding and subsequent paragraphs are incorporated by reference.

136.     RPD Officers and/or Sheriff's Deputies intentionally used military grade weapons, "less-than-lethal" weapons, and chemical weapons against Ms. WOODWARD on September 5-6, 2020 without first having made an individualized determination that it was reasonable to use any force against Plaintiff based on her own individual conduct, instead of any perceived "group conduct."

137.     RPD Officers and/or Sheriff's Deputies intentionally shot Ms. WOODWARD in the back as she was wheeling away from them and attempting to disperse from the area.

138.     The types and levels of force Defendants used against Ms. WOODWARD were in contravention of, or inconsistent with, related policies and/or training.

139.     Ms. WOODWARD was not threatening the law enforcement officers or any other person at any time.

140.     By the aforedescribed conduct, defendants, their agents, servants and employees, acting within the scope of their employment, intentionally, willfully and maliciously battered Plaintiff Ms. WOODWARD, when they, in a hostile and/or offensive manner struck Plaintiff— including by subjecting her to tear gas and other chemicals—without her consent and with the intention of causing harmful and/or offensive bodily contact to the Plaintiff and caused such battery.

27

141.    The RPD Officers were at all times agents, servants, and employees acting within the scope of their employment by the Defendant CITY and the RPD, which are therefore responsible for their conduct.

142.    The Defendant CITY, as the employer of the individual RPD defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

143.    At no point during the incidents described herein did the circumstances necessitate or support the above applications of force utilized by the defendant RPD officers and/or Sheriff's Deputies against Plaintiff.

144.    The actions of the RPD officers and Sheriff's Deputies were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

145.    Accordingly, Plaintiff was harmed as a direct result of Defendants' unlawful conduct and is entitled to damages, injunctive relief, and reasonable attorney's fees and costs in an amount to be determined by the Court.

### FOURTH CLAIM FOR RELIEF
**First Amendment Infringements, Including First Amendment Retaliation**
***Pursuant to 42 U.S.C. § 1983***

146.    All preceding and subsequent paragraphs are incorporated by reference.

147.    In committing the acts and omissions complained of herein, Defendants acted under color of state law—individually, in concert, and through a conspiracy—to deprive Plaintiff of the rights protected by the First Amendment to the United States Constitution.

148.    Defendants (a) retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment, and (b) imposed restrictions on such protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to, in arresting Plaintiff, in subjecting Plaintiff to excessive force, in selectively enforcing laws and

28

regulations against Plaintiff, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

149.    Defendants engaged in those and other acts and omissions complained of herein in retaliation for Plaintiff's protected speech and/or conduct.

150.    Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

151.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar protected conduct in the future.

152.    The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

153.    Accordingly, Plaintiff was harmed as a direct result of Defendants' unlawful conduct and is entitled to damages, injunctive relief, and reasonable attorney's fees and costs in an amount to be determined by the Court.

### FIFTH CLAIM FOR RELIEF
**Failure To Intervene**
***Pursuant to 42 U.S.C. § 1983***

154.    All preceding and subsequent paragraphs are incorporated by reference.

155.    The individual defendants all had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of her constitutional rights by the other Defendant RPD officers.

156.    The individual defendants failed to intervene on Plaintiff's behalf despite having had realistic opportunities to do so.

29

157. The individual defendants failed to intervene on Plaintiff's behalf despite having substantially contributed to the circumstances within which Plaintiff's rights were violated by their affirmative conduct.

158. As a result of the aforementioned conduct of the individual defendants, Plaintiff's constitutional rights were violated.

159. Defendants' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

160. Accordingly, Plaintiff was harmed as a direct result of Defendants' unlawful conduct and is entitled to damages, injunctive relief, and reasonable attorney's fees and costs in an amount to be determined by the Court.

## SIXTH CLAIM FOR RELIEF
### Negligence
### (Against BAXTER)

161. All preceding and subsequent paragraphs are incorporated by reference.

162. Defendant BAXTER was negligent in the training, supervision and discipline of the Defendant Sheriff's Deputies, who were provided, upon information and belief, no training for policing protests, engaging in peaceful crowd control, or how to properly and safely use the "less lethal" weapons; or the training they were provided was inadequate.

163. BAXTER had a duty to ensure that his Sheriff's Deputies were properly trained in policing peaceful protests and other large demonstrations, to keep the participants safe promote First Amendment expression.

164. BAXTER knew or should have known that the Hazard Mitigation Plan conflated peaceful protests and demonstrations with riots and violent mobs, and that in the absence of

30

proper training, his Sheriff's Deputies would use unreasonable and excessive force against peaceful demonstrators.

165.    BAXTER knew or should have known that exposure to chemical weapons such as pepper balls, tear gas and OC spray can cause serious adverse health effects, including menstrual irregularities and infertility.

166.    BAXTER breached his duty to keep demonstrators safe by, among other things, training his Sheriff's Deputies to police peaceful demonstrations in the same manner as they would police violent mobs.

167.    BAXTER breached his duty to keep demonstrators safe by, among other things, training his Sheriff's Deputies to use chemical weapons indiscriminately against protesters.

168.    BAXTER breached his duty to keep demonstrators safe by, among other things, training his Sheriff's Deputies to that they could shoot pepper balls and other "less-than-lethal" projectiles at protesters' heads.

169.    BAXTER breached his duty to keep protesters and demonstrators safe by, among other things, training Sheriff's Deputies to use "less-than-lethal" weapons and chemical weapons against "groups" of protesters based on perceived "group conduct", without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

170.    Ms. WOODWARD's injuries from September 5-6, 2020 were a direct and proximate result BAXTER negligently training his deputies in how to lawfully police First Amendment activities.

171.    Moreover, despite their use of extreme and excessive violence against protesters on September 2-6, 2020, BAXTER was negligent failing to supervise or discipline any of his

31

Sheriff's Deputies related to any force used protesters on those nights prior to Plaintiff's injury. BAXTER's negligence was the direct and proximate cause of Plaintiff's injuries.

172.    Accordingly, Plaintiff was harmed as a direct result of Defendants' unlawful conduct and is entitled to damages, injunctive relief, and reasonable attorney's fees and costs in an amount to be determined by the Court.

### SEVENTH CLAIM FOR RELIEF
**Negligence**

**(Against the CITY)**

173.    All preceding and subsequent paragraphs are incorporated by reference.

174.    Defendant CITY was negligent in the training, supervision and discipline of the Defendant RPD officers, who were provided, upon information and belief, no training for policing protests, engaging in peaceful crowd control, or how to properly and safely use the "less lethal" weapons; or the training they were provided was inadequate.

175.    The CITY had a duty to ensure that RPD officers were properly trained in policing peaceful protests and other large demonstrations, to keep the participants safe promote First Amendment expression.

176.    The CITY knew or should have known that its training was inadequate; that in the past, numerous RPD officers had seriously injured peaceful demonstrators; and that in the absence of proper training, his RPD officers would use unreasonable and excessive force against peaceful demonstrators.

177.    The CITY knew or should have known that exposure to chemical weapons such as pepper balls, tear gas and OC spray can cause serious adverse health effects, including menstrual irregularities and infertility.

32

178. The CITY breached his duty to keep demonstrators safe by, among other things, training RPD officers to police peaceful demonstrations in the same manner as they would police violent mobs.

179. The CITY breached its duty to keep demonstrators safe by, among other things, training RPD officers to use chemical weapons indiscriminately against protesters.

180. The CITY breached its duty to keep demonstrators safe by, among other things, training RPD officers to use "less-than-lethal" weapons and chemical weapons against "groups" of protesters based on perceived "group conduct", without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

181. Ms. WOODWARD's injuries sustained on September 5-6, 2020 were a direct and proximate result of the CITY negligently training RPD officers in how to lawfully police First Amendment activities.

182. Moreover, despite their use of extreme and excessive violence against protesters on September 2-6, 2020, the CITY was negligent failing to supervise or discipline any of RPD officers related to any force used protesters on those nights prior to Plaintiff's injury. The CITY's negligence was the direct and proximate cause of Plaintiff's injuries.

183. Accordingly, Plaintiff was harmed as a direct result of Defendants' unlawful conduct and is entitled to damages, injunctive relief, and reasonable attorney's fees and costs in an amount to be determined by the Court.

## EIGHTH CLAIM FOR RELIEF

### Negligence

### (Against the Individual Defendants)

184. All preceding and subsequent paragraphs are incorporated by reference.

33

185.    The Defendant RPD officers and Sheriff's Deputies, their agents, servants, employees, officers and deputies were negligent using the "less lethal" military grade weapons and chemical weapons against Plaintiff, which was the direct and proximate cause of Plaintiff's injuries sustained on September 5-6, 2020.

186.    The Defendant RPD officers and Sheriff's Deputies had a duty to permit the protesters to engage in First Amendment Activities and to protect them from harm or physical violence.

187.    The Defendant RPD officers and Sheriff's Deputies had a duty to not use force against any individual protester in the absence of individualized cause or legal justification for the use of force.

188.    The Defendant RPD officers and Sheriff's Deputies breached that duty by firing "less lethal" munitions and chemical weapons into "groups" of protesters based on perceived "group conduct," without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

189.    The breach of that duty by the Defendant RPD officers and Sheriff's Deputies was the direct and proximately cause of Ms. WOODWARD's serious injuries described herein.

190.    Defendant RPD officers and/or Sheriff's Deputies' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

191.    Accordingly, Plaintiff was harmed as a direct result of Defendants' unlawful conduct and is entitled to damages, injunctive relief, and reasonable attorney's fees and costs in an amount to be determined by the Court.

## NINTH CLAIM FOR RELIEF
**Discrimination in violation of Title II of the Americans with Disabilities Act**

34

## Pursuant to 42 U.S.C. § 12132 *et seq.*

### (Against Defendant, City of Rochester)

192.    All preceding and subsequent paragraphs are incorporated by reference.

193.    Under Title II of the ADA, it is illegal for public entities to discriminate against qualified individuals with disabilities. Under 42 U.S.C. § 12132, "no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity."

194.    At all times relevant to this action, Ms. WOODWARD has been paralyzed from the waist area down and has required a wheelchair for mobility.

195.    Ms. WOODWARD is a "qualified individual with a disability" under the ADA because her paralysis "substantially limits one or more major life activities," as defined by 42 U.S.C. § 12102(2).

196.    Defendant City of Rochester is a "public entity," as defined by 42 U.S.C. § 12131(1).

197.    Defendant City of Rochester unlawfully discriminated against Ms. WOODWARD in violation of the ADA by failing to accommodate Ms. WOODWARD'S qualified disability during her arrest and detention.

198.    By refusing to provide accessible services, the RPD discriminated against Ms. WOODWARD, adding an additional layer of punishment, injury, and indignity to the arrest and detention processes on September 16, 2020 solely because of Ms. WOODWARD'S disability. A person who does not have a disability would not otherwise have experienced this harm.

35

199.    Accordingly, Ms. WOODWARD was harmed as a direct result of Defendants' unlawful and discriminatory conduct and is entitled to damages, injunctive relief, and reasonable attorney's fees and costs in an amount to be determined by the Court.

## TENTH CLAIM FOR RELIEF
**Discrimination in violation of Section 504 of the Rehabilitation Act
(Title 29 U.S.C. § 794 *et seq.*)**

**(Against City of Rochester)**

200.    All preceding and subsequent paragraphs are incorporated by reference.

201.    Section 504 provides that it is illegal for "any program or activity receiving Federal financial assistance" to subject any "qualified individual with a disability" to discrimination under 29 U.S.C.A. § 794(a).

202.    At all times relevant to this action, Ms. WOODWARD has been paralyzed from the waist area down and has required a wheelchair for mobility.

203.    Ms. WOODWARD is thus a "qualified individual with a disability" under Section 504, as defined by 29 U.S.C.A. § 705(20) and 42 U.S.C.A. 12102(2).

204.    At all times relevant to this action, both Defendant City of Rochester and their agency, the RPD, received funding from the federal government of the United States and were "programs or activities," as defined by 29 U.S.C.A. § 794(b).

205.    Defendant City of Rochester unlawfully discriminated against Ms. WOODWARD in violation of Section 504 by failing to accommodate Ms. WOODWARD's qualified disability during her arrest, transport, and detention.

206.    Furthermore, the RPD's conduct during Ms. WOODWARD's arrest and detention on September 16, 2020 added an additional layer of punishment and indignity that a person who does not have a disability would not otherwise experience.

36

207.   Accordingly, Ms. WOODWARD was harmed as a direct result of Defendants'
unlawful and discriminatory conduct and is entitled to damages, injunctive relief, and reasonable
attorneys' fees and costs in an amount to be determined by the Court.

## ELEVENTH CLAIM FOR RELIEF
### Discrimination in violation of New York State Human Rights Law
### (New York Executive Law §§ 292 et seq. and the New York Civil Rights Law §§ 40 et seq.)

### (Against City of Rochester, SCHIFFMAN, ARROWOOD and BURGSTROM)

208.   All preceding and subsequent paragraphs are incorporated by reference.

209.   The NYSHRL provides that "it shall be unlawful discriminatory practice for any .
. . place or provider of public accommodation" to discriminate against a person with a disability
either directly or indirectly under N.Y. Exec. Law § 296(2)(a).

210.   At all times relevant to this action, Ms. WOODWARD has been paralyzed from
the waist area down and has required a wheelchair for mobility.

211.   Ms. WOODWARD has a "disability" under N.Y. Exec. Law § 296(21) because
she has multiple physical impairments to her body.

212.   Defendant City of Rochester, and their agency the RPD, are "persons" as defined
by § 296(1), and "places and providers of public accommodation" as defined by § 296(9).

213.   Individual RPD defendants are agents and employees of a public accommodation.

214.   Defendant City of Rochester and all RPD officers unlawfully discriminated
against Ms. WOODWARD by failing to accommodate her disability during her arrest and
detention in violation of the NYSHRL.

215.   Furthermore, the RPD's conduct during Ms. WOODWARD's arrest and detention
on September 16, 2020 added an additional layer of punishment and indignity that a person who
does not have a disability would not otherwise experience.

37

216.    Accordingly, Ms. WOODWARD was harmed as a direct result of Defendants' unlawful and discriminatory conduct and is entitled to damages, injunctive relief, and reasonable attorney's fees and costs in an amount to be determined by the Court.

### TWELFTH CLAIM FOR RELIEF
**Municipal Liability for Policies, Practices and Customs of Discriminating Against Wheelchair Users**
***Pursuant to 42 U.S.C. § 1983***

### (Against City of Rochester)

217.    All preceding and subsequent paragraphs are incorporated by reference.

218.    Defendant City of Rochester has no written policy in place concerning how its employees arrest, detain and transport people who use wheelchairs. In fact, the current RPD General Orders provides officers with no guidance whatsoever regarding how to arrest, detain and transport people who use wheelchairs.

219.    It was highly predictable that RPD personnel would encounter, arrest, detain and need to transport people who use wheelchairs in Rochester. Consequently, Defendant City of Rochester knew to a moral certainty that RPD personnel would encounter, arrest, detain and need to transport people who use wheelchairs.

220.    It continues to be highly predictable that RPD personnel will encounter, arrest, detain and need to transport people who use wheelchairs in Rochester. Consequently, Defendant City of Rochester knows to a moral certainty that RPD personnel will continue to encounter, arrest, detain and need to transport people who use wheelchairs.

221.    In fact, Defendant City of Rochester has notice of numerous complaints in which RPD officers allegedly violated the rights of people who use wheelchairs during the arrest, detention and transport; and/or were unable to transport wheelchair users due to the lack of wheelchair accessible transport vehicles.

38

222.     Furthermore, Defendant City of Rochester knows that the RPD's policies and methods for the arrest, detention and transport of people who use wheelchairs are insufficient because there is a history of RPD officers having difficulty, mishandling, and failing to accommodate people who use wheelchairs during their arrest, detention and transport. Defendant City of Rochester has consequently long been aware that the RPD's failures would result, and will continue to result, in the deprivation of individual wheelchair users' constitutional and federal rights.

223.     Defendant City of Rochester's deliberate choice to ignore the known problems with RPD officers being unable to transport people who use wheelchairs, and the City of Rochester's failure to implement an adequate policy or practice to guide its officers in the RPD concerning how to arrest, detain and transport arrestees who use wheelchairs, resulted in the violation of Ms. WOODWARD's rights secured by the Fourth and Fourteenth Amendments and the ADA. The RPD's customs and practices for the arrest and detention of people who use wheelchairs, and its inability to transport people who use wheelchairs, are discriminatory and dangerous.

224.     The City of Rochester also failed to adequately train, monitor and supervise its employees regarding their constitutional and federal duty, despite the RPD's history of encounters with people who use wheelchairs and the predictability that RPD personnel would continue to encounter and need to transport people who use wheelchairs in Rochester.

225.     By permitting, tolerating and sanctioning a persistent and widespread policy, practice and custom pursuant to which Ms. WOODWARD was subjected to the conduct alleged herein, Defendant City of Rochester has deprived Ms. WOODWARD of rights, remedies, privileges and immunities guaranteed to every citizen of the United States secured by 42 U.S.C.

39

§ 1983, including but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution, the ADA, and other federal laws.

226.    Accordingly, Ms. WOODWARD was harmed as a direct result of Defendants' unlawful and discriminatory conduct and is entitled to damages, injunctive relief, and reasonable attorney's fees and costs in an amount to be determined by the Court.

WHEREFORE and in light of the foregoing, Plaintiff demands judgment on all claims for relief:

a.    Empanel a jury;

b.    Award compensatory and punitive damages;

c.    The Plaintiff demands the foregoing relief jointly and severally against all of the defendants in an amount in excess of the jurisdiction of all lower Courts, except that the punitive damages demands are, as a matter of law, not recoverable against a municipality and therefore are not made against the City;

d.    Declare that the Defendants have violated their obligations under the ADA, Section 504, Section 1983 and the NYSHRL;

e.    Order appropriate injunctive relief against Defendants, including, but not limited to providing wheelchair accessible vehicles and services in connection with the arrest and transport processes, and appropriate policies, training and procedures governing the same;

f.    Award Plaintiff reasonable attorney's fees and costs, and interest pursuant to 42 U.S.C. § 1988; and

g.    Such other and further relief as the court may deem just and proper.

40

Dated: New York, New York
September 1, 2021

Respectfully Submitted,

ROTH & ROTH, LLP.

Elliot Dolby Shields
Co-counsel for Plaintiff
192 Lexington Avenue, Suite 802
New York, New York 10024
(212) 425-1020

Easton Thompson Kasperek Shiffrin LLP
Donald Thompson
Co-counsel for Plaintiff
16 West Main Street, Suite 243
Rochester, New York 14614
Ph: (585) 423-8290

41

## ATTORNEY'S VERIFICATION

**ELLIOT DOLBY SHIELDS,** an attorney duly admitted to practice before the Courts of the State of New York, affirms the following to be true under the penalties of perjury:

I am associated with Roth & Roth, LLP, attorneys for the Plaintiff, I have read the annexed **VERIFIED COMPLAINT** and know the contents thereof, based on the files maintained in my office, and the same are true to my knowledge, except those matters therein which are stated to be alleged upon information and belief, and as to those matters I believe them to be true. My belief, as to those matters therein not stated upon knowledge, is based upon facts, records, and other pertinent information contained in my files. This verification is made by me and not the Plaintiff because I maintain my office in a different county from where the Plaintiff resides.

DATED: New York, New York
September 1, 2021

ELLIOT DOLBY SHIELDS

42