**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEPHANIE WOODWARD,<br><br>Plaintiff,<br><br>-against-<br><br>THE CITY OF ROCHESTER, a municipal entity, RICHARD ARROWOOD, STEPHANIE BURGSTROM, ERIC SCHIFFMAN, "JOHN DOE POLICE OFFICERS 1-200" (names and number of whom are unknown at present), COUNTY OF MONROE, TODD BAXTER, "RICHARD ROE SHERIFF'S DEPUTIES 1-200" (names and number of whom are unknown at present), and other unidentified members of the Rochester Police Department and Monroe County Sheriff's Office,<br><br>Defendants. | 21-CV-6685<br><br>**FIRST AMENDED COMPLAINT**<br>**[JURY TRIAL DEMANDED]** |

Plaintiff, by her attorneys, ROTH & ROTH, LLP and EASTON THOMPSON KASPAREK SHIFFRIN LLP, complaining of the defendants, respectfully allege as follows:

## I.   PRELIMINARY STATEMENT

1.      This is a civil rights action seeking damages and injunctive relief from Defendants, the City of Rochester ("CITY") and the John Doe Rochester Police Department ("RPD") officers; and the County of Monroe ("COUNTY"), Monroe County Sheriff Todd Baxter ("BAXTER") and the Richard Roe Monroe County Sheriff's Office ("MCSO") Deputies, for Defendants' violations of Plaintiff Stephanie Woodward's civil rights on September 5, 2020 and September 16, 2020.

2.      Plaintiff STEPHANIE WOODWARD is 33 years old. She is a person with a disability. Ms. WOODWARD is paralyzed from the waist area down. She cannot walk and exclusively uses a wheelchair for mobility. Ms. WOODWARD requires frequent use and access to the bathroom.

1

3.      On September 16, 2020, while she was attending a peaceful protest in front of City Hall, RPD officers arrested and detained Ms. WOODWARD in a discriminatory and inaccessible way that failed to accommodate Ms. WOODWARD's disability, caused her injury and humiliation, and violated her rights.

4.      On September 16, 2020, approximately 16 other protesters were arrested; all of them were transported to the Public Safety Building ("PSB") in vans owned by the COUNTY and operated by the MCSO for booking and arrest processing, where they had access to bathrooms.

5.      Following her arrest, the RPD officers could not transport Ms. WOODWARD to the PSB for arrest processing—as they did with all other protesters who were arrested who were not wheelchair users—because neither the RPD nor the MCSO owns or has access to any wheelchair-accessible transport vehicles.

6.      Because the RPD and MCSO lack wheelchair accessible transportation vehicles, Ms. WOODWARD was detained on the street where she was arrested, for over two hours. Ms. WOODWARD repeatedly requested that RPD officers permit her to use the bathroom, but her requests were ignored. As a result, Ms. WOODWARD urinated on herself.

7.      Today, more than 30 years after the passage of the Americans with Disabilities Act, the City of Rochester and County of Monroe still fail to provide accessible transportation vehicles when a person who uses a wheelchair is arrested, detained, or transported by RPD or MCSO personnel.

8.      The City of Rochester also fails to offer adequate training, policies, and procedures to govern situations where a person who uses a wheelchair is arrested and must be transported. When it arrested and detained Ms. WOODWARD for several hours on September

2

16, 2020, the RPD used discriminatory, inaccessible, and degrading methods. As a result, Ms. WOODWARD experienced discrimination, humiliation, and indignity.

9.      By refusing to provide accessible services, the RPD and MCSO discriminated against Ms. WOODWARD, adding an additional layer of punishment, injury, and indignity to the arrest and detention process, solely because of Ms. WOODWARD's disability. Thus, the CITY and COUNTY are liable to Ms. WOODWARD under the Federal Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act, ("Section 504"), the New York State Human Rights Law, N.Y. Exec. Law § 290 *et. seq.* ("NYSHRL"), and pursuant to 42 U.S.C. § 1983 ("Section 1983").

10.     Ms. WOODWARD also brings this action for compensatory damages, punitive damages, and attorney's fees pursuant to New York State law and 42 U.S.C. §§ 1983 and 1988 for damages she sustained from being attacked by RPD officers and Sheriff's Deputies with chemical weapons on September 5, 2020.

11.     On September 5, 2020, Ms. WOODWARD attended a protest to call for justice for Daniel Prude, to mourn the loss of Black lives, demand the City finally end its racist and brutal policing practices, and call for new visions of public safety that value Black lives.

12.     In response, RPD officers and Sheriff's Deputies "kettled" hundreds of protesters at the intersection of Broad Street and Exchange Blvd., including Ms. WOODWARD, attacked them with tear gas, sprayed them with pepper spray, and attacked them with pepper balls.

13.     Chemical weapons, like tear gas, are banned in warfare because they are indiscriminate weapons by design, especially when deployed by firing a grenade or canister. Chemical weapons can cause severe injury or death, and, even at low concentrations, exposure to tear gas presents a risk of serious, irreversible health effects.

3

14.     For Ms. WOODWARD, exposure to chemical weapons on September 5, 2020 has caused menstrual irregularities and infertility.

## II.     PARTIES

15.     Plaintiff STEPHANIE WOODWARD is a Citizen of the United States and is a qualified individual with a disability under federal law. She is a resident of the Town of Greece, State of New York. She works at the Empire Justice Center in downtown Rochester, and travels into the City of Rochester on a nearly daily basis.

16.     Defendant CITY OF ROCHESTER ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the RPD.

17.     Defendant CITY OF ROCHESTER ("CITY") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York. Defendant CITY maintains the City of Rochester Police Department, a duly authorized police department, authorized to perform all functions of a police department. RPD acts as Defendant CITY's agent and Defendant CITY assumes the risks incidental to the maintenance of a police department and the employment of police officers. The CITY and RPD received federal financial assistance at all times relevant to this Complaint.

18.     RICHARD ARROWOOD ("ARROWOOD"), ERIC SCHIFFMAN ("SCHIFFMAN"), STEPHANIE BURGSTROM ("BURGSTROM") and "JOHN DOE" ROCHESTER POLICE DEPARTMENT OFFICERS 1–200 (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Police Officers with the

4

RPD. At all relevant times, these defendants were acting within the scope of their employment with the CITY and RPD and under color of state law. They are sued in their individual capacities. John Doe RPD Officers are referred to collectively as "the RPD officers."

19.     Defendant COUNTY OF MONROE ("COUNTY") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York. Defendant COUNTY maintains the Monroe County Sheriff's Office ("MCSO") and pays the salaries of the Monroe County Sheriff and MCSO deputies. MCSO acts as Defendant COUNTY'S agent and Defendant COUNTY assumes the risks incidental to the maintenance of the MCSO as the COUNTY's police department.

20.     Defendant TODD BAXTER ("Sheriff Baxter" or "BAXTER") was, at all times relevant herein, the duly elected Sheriff of the County of Monroe. At all relevant times, Defendant BAXTER was acting within the scope of his employment and under color of state law. He is sued in his individual and official capacity.

21.     "RICHARD ROE" MONROE COUNTY SHERIFF'S DEPUTIES 1–200 (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Deputy Sheriffs with the Monroe County Sheriff's Office ("MCSO"). At all relevant times, these defendants were acting within the scope of their employment with the County and under Sheriff BAXTER and acting under color of state law. They are sued in their individual capacities. They are referred to collectively as "the Sheriff's Deputies."

22.     BAXTER is responsible for the training, supervision and discipline of the Defendant Sheriff's Deputies under state law.

### III.  JURISDICTION, VENUE AND CONDITIONS PRECEDENT

23.     This Court has federal-question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 over claims arising out of violations of the United States Constitution and 42 U.S.C. §§ 1983 and 1985.

24.     The Court has pendent jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. §1367.

25.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Western District of New York, the judicial district where the claims arose and in which the Defendants conduct business.

26.     Plaintiff filed timely Notices of Claim against the City and County, in compliance with the Municipal Law § 50.

27.     The CITY and County each waived 50-h hearings.

28.     More than thirty (30) days have elapsed since service of said Notices of Claim were filed and the City and County have failed to pay or adjust the claim.

29.     This action was brought within a year of the event that gives rise to Plaintiff's causes of action under New York State law and Plaintiffs have complied with all of the statutory prerequisites for bringing this action.

### III. JURY TRIAL DEMAND

30.     Plaintiff demands a trial by jury on each and every claim to which they are legally entitled to a jury.

### IV.  FACTUAL ALLEGATIONS

#### A.  Ms. Woodward's Disability

31.     Ms. Woodward has a visible physical disability.

32.     Ms. Woodward is paralyzed from the waist area down, cannot walk, and requires a wheelchair for mobility.

33.     On September 5-6 and 16, 2020, at the locations hereinafter mentioned and at all times herein, Ms. WOODWARD was confined to a wheelchair.

34.     Ms. WOODWARD also has limited bladder function as a result of her paralysis.

35.     Ms. WOODWARD is a qualified individual with a disability, as defined by the ADA, 42 U.S.C. § 12102, and Section 504, 29 U.S.C.A. § 794(a). She also has a disability as defined by N.Y. Exec. Law § 292 (21), the NYSHRL.

36.     Upon information and belief, all officers responsible for Ms. WOODWARD's arrest, detention, and transportation, including SCHIFFMAN, were aware of Ms. WOODWARD's visible physical disability.

**B.  Facts Common to All Causes of Action.**

37.     On March 23, 2020, Daniel Prude's family sought help from the Rochester Police Department ("RPD") as Daniel was suffering an acute mental health crisis. Tragically, that call for help ended with Daniel naked and handcuffed with his face covered by a "spit hood," as an RPD officer pushed his head into the freezing asphalt for several minutes. RPD officers on the scene mocked Daniel and chatted with each other while he asphyxiated. Daniel was declared brain dead that night; he was taken off life support and died on March 30.

38.     When the video of RPD Officers killing Daniel Prude was finally made public on September 2, 2020, it sparked nationwide outrage. In Rochester, thousands of people gathered to mourn the loss of Black lives, demand the CITY finally end its racist and brutal policing practices, and call for new visions of public safety that value Black lives.

39.     On September 2-6, 2020, the RPD and MCSO defendants responded to peaceful protests with extreme violence—including the indiscriminate use of tear gas and pepper spray, 40 millimeter blunt-impact projectiles, thousands of pepper balls, flash-bang grenades and other

7

supposedly "less-than-lethal" munitions. Peaceful protests continued in the months after these initial nights, including a peaceful protest on September 15-16, 2020.

40.     Ms. WOODWARD attended protests on the night of Saturday September 5-6, 2020 and the morning of September 16, 2020, which form the basis for her claims in this lawsuit.

### C. Defendants attack Ms. Woodward with Chemical Weapons on Saturday, September 5, 2020 to Sunday September 6, 2020.

41.     Like they did on prior nights after the video of RPD officers killing Daniel Prude was released, on the night of Saturday September 5-6, 2020, RPD officers and Sheriff's deputies used military grade weapons to attack peaceful protesters in downtown Rochester.

42.     RPD officers and Sheriff's Deputies first escorted Ms. WOODWARD and other protesters as they marched in the streets of downtown Rochester, until they led marchers to the intersection of Broad Street and Exchange Boulevard, which law enforcement had closed to vehicular traffic with metal barricades. Ms. WOODWARD marched with the crowd until police kettled them at the intersection of Broad and Exchange. Ms. WOODWARD and the other peaceful protesters sang and chanted.

43.     RPD officers and Sheriff's deputies trapped peaceful protesters—including Ms. WOODWARD—at the intersection of Broad Street and Exchange Boulevard. After several minutes of peaceful protests and chanting, law enforcement almost immediately began attacking them. RPD officers and Sheriff's deputies began to launch flash bang grenades, release tear gas, and shoot pepper balls into the crowd indiscriminately.

44.     Defendants issued dispersal orders, knowing that it was physically impossible for Ms. WOODWARD and the other protesters to immediately comply with the orders.

45.     Suddenly, at approximately 10:25   p.m., without warning, cause, or justification, RPD officers and Sheriff's Deputies attacked Ms. WOODWARD and the other protesters with chemical weapons, flash bang grenades and other "less lethal" weapons.

46.     At approximately 10:30 p.m., a RPD officer or Sheriff's Deputy threw a tear gas cannister at Ms. WOODWARD, which went off when it was underneath her wheelchair and engulfed her in tear gas.

47.     When Ms. WOODWARD was finally able to turn her wheelchair around, the crowd had dispersed behind her.

48.     Ms. WOODWARD began to retreat north on Exchange towards Main Street. While her back was to the barricades, one or more RPD officers and/or Sheriff's Deputies, shot Ms. WOODWARD in the back with pepper balls and/or other projectiles. At least one pepper ball hit Ms. WOODWARD in the back of her right shoulder.

49.     This was a violation of RPD policy and good and accepted police practices, which prohibit shooting pepper balls at a subject's upper body.

50.     When Ms. WOODWARD was shot in the back, there was no one else near her other than her husband (who is also a wheelchair user); thus, it is clear that the RPD officers and/or Sheriff's Deputies intended to shoot them in the back as they wheeled away from law enforcement.

51.     It was objectively unreasonable for the RPD officers and/or Sheriff's Deputies to shoot Ms. WOODWARD in the back as she was retreating from law enforcement.

52.     At no time did Ms. WOODWARD commit any crime or violation.

53.     At no time did Ms. WOODWARD threaten police in any way.

54.     The RPD Officers lacked cause or any justification to or use "chemical weapons" or any physical force against Ms. WOODWARD.

55.     Any no time did Defendants make an individualized determination that they had cause or legal justification to use force against Ms. WOODWARD; instead, the use of force was based on perceived "group conduct."

56.     As a result of the chemical weapons Defendants used against her on September 5-6, 2020, Ms. WOODWARD sustained irritation to her skin, eyes, mouth, nose and lungs and menstrual irregularities.

57.     As a result of the chemical weapons Defendants used against her on September 5-6, 2020, Ms. WOODWARD has been unable to become pregnant, despite trying for over one year.

58.     As a result of being shot in the back of her right shoulder with a projectile by Defendants on September 5-6, 2020, Ms. WOODWARD sustained a shoulder injury that impeded her ability to independently propel her wheelchair.

59.     Ms. WOODWARD also sustained physical pain and emotional and psychological harm from being attacked by the RPD officers and Sheriff's Deputies.

D.  **Coordination Between the City and RPD, and County and BAXTER, to Develop the Unlawful Protest Response Plan.**

60.     For months before the body worn camera video of RPD officers brutally killing Daniel Prude was released, the CITY and RPD anticipated and planned for large-scale protests when the video was eventually released. The City and RPD coordinated with the County, BAXTER and MSCSO to develop a joint protest response plan.

61.     From the very beginning, policymaking officials of the City and RPD (including former Chief Singletary), and the County and MSCO (including BAXTER), zeroed in on the fact

10

that, unlike other protests, these were focused directly on police misconduct and racism; policymaking officials at the highest levels subscribed to the theory that Black Lives Matter protests are led by a nationwide conspiracy of outside agitators bent on violence.

62.     This manifested in the training of their officers, both before and since, that nonviolent protestors will stand in front to shield violent protestors who throw objects from behind them, and that not everyone standing with their hands up is peaceful. That training conveniently justifies and encourages suppressing all protestors by collectively punishing nonviolent ones. The message to their officers was clear: there is no such thing as a peaceful protestor.

63.     During those several months—from at least June 4, 2020 to September 2, 2020— the CITY and RPD developed a protest response plan that included responding to peaceful protests with extreme violence; using military-grade weapons against protesters; using overwhelming amounts of chemical weapons against groups of protesters, without making individualized determinations that probable cause existed to believe that any individual within the group had committed a crime or violation; and otherwise to retaliate against protesters based on their objection to the message protesters were expressing.

64.     Prior to the protests that erupted on September 2, 2020, former RPD Chief La'Ron Singletary and Monroe County Sheriff TODD BAXTER, along with other final policymakers with respect to police practices for the City and County, designed and orchestrated the unlawful protest response plan.

65.     RPD officers and MCSO deputies were ordered by Singletary, BAXTER and other final policymakers to suppress the protests: RPD officers and MCSO deputies were given

11

military-grade equipment and authority to spray and gas indiscriminately, aim high with pepper

balls and KIPS, and inflict pain as a deterrent.

66.     The multi-agency response to the September 2020 Black Lives Matter protests

was managed under a Unified Command (UC) system between the CITY and the RPD; the

COUNTY, MCSO and BAXTER.

67.     On the nights of September 5-6, 2020, policymaking officials for the RPD and

CITY, along with BAXTER and other policymaking officials of the MCSO and County, were

present in the Command Posts and were overseeing and directing the response of the RPD

officers and Sheriff's Deputies to the protesters—including the use of specific tactics and

weapons.

68.     The natural, inevitable result of the City and County policies is exactly what

transpired: officers complying with official policies on the use of the "less lethal" force caused

serious injuries peaceful protestors and others who were there to document and record the law

enforcement response. Therefore, there was a "direct causal link" between the offending policies

and the constitutional deprivations Ms. WOODWARD suffered; in other words, Ms.

WOODWARD'S particular injuries were incurred *because* of the execution of the unlawful City

and County policies.

69.     Over the Course of three nights, from September 2-6, 2020, RPD officers and

Sheriff's Deputies implemented the unlawful protest response plan (PRP) and responded to

peaceful protests with extreme violence:

- The City and County Defendants created a Unified Command (UC) to establish a common
  set of objectives, strategies, and a single "protest response plan" (PRP). The objective of
  this coordinated protest response PRP was to create an intimidating, militarized, multi-
  agency response under a unified command system. Under the response plan, the City and
  County Defendants trained and instructed RPD officers and Sheriff's Deputies to use force
  against "groups" of protesters, without first having made an individualized determination

that there was a lawful basis to use force against any individual in the group based on their own individual conduct, as opposed to the perceived "group conduct."

- RPD officers fired tear gas canisters 77 times into groups of protesters expressly gathered to support Black lives, at journalists, and at legal observers and others attempting to report on and record the abuse, like Ms. FLANNERY, and at medics there to provide care and safety to the protesters—often after they blocked off all escape routes to get away from the chemical clouds. The tear gas canisters are themselves projectile weapons capable of causing significant blunt trauma, including bone fractures, lacerations, internal bleeding, and death. One protester struck in the face by a canister required stitches inside and outside of her mouth and has permanent facial scarring.

- Over those three nights, RPD officers discharged 6,100 pepper balls at people protesting the Departments' aggressive and racist practices. RPD officers shot protesters with 40mm direct-impact foam bullets—kinetic impact projectiles ("KIPS")—which can cause a range of injuries including death. KIPs are inherently inaccurate when fired from afar and so they often injure bystanders and strike vulnerable body parts of intended and unintended targets. RPD officers fired CTS 40 mm munitions during the protest. The CTS website cautions that shots to the head, neck, thorax, heart, or spine can result in fatal or serious injury. Use of force reports by RPD officers detail deploying 40mm munitions at individuals' abdomens at the September 5 demonstration. RPD officers also used flash bang grenades, deployed sonic weapons, and struck protesters with batons.

- RPD officers and Sheriff's Deputies fired the "less lethal" munitions indiscriminately into crowds of protesters, including the indiscriminate use of tear gas and pepper spray, 40 millimeter blunt-impact projectiles, thousands of pepper balls, flash-bang grenades and other supposedly "less-than-lethal" munitions.

- RPD Chief La'Ron Singletary, a policymaker for the CITY on police practices, designed and implemented the protest response plan on behalf of the CITY, and implemented the unlawful policies that required RPD officers to use chemical weapons indiscriminately against protesters, despite knowing that the chemical weapons cause serious and permanent harm, such as permanent harm to the female reproductive system; and to otherwise use unlawful and excessive force against protesters, journalists, legal observers and others as detailed herein, in violation of their First, Fourth and Fourteenth Amendment rights.

- Monroe County Sheriff TODD BAXTER, a policymaker for the COUNTY on police practices, designed and implemented the protest response plan on behalf of the COUNTY, and implemented the unlawful policies that required Sheriff's Deputies to use chemical weapons indiscriminately against protesters, despite knowing that the chemical weapons cause serious and permanent harm, such as permanent harm to the female reproductive system; and to otherwise use unlawful and excessive force against protesters, journalists, legal observers and others as detailed herein, in violation of their First, Fourth and Fourteenth Amendment rights.

70.     Moreover, City officials effectively ratified the RPD's violent response. While hundreds of peaceful protesters, many of them Black and brown, were injured by RPD's violent response to the demonstrations, the Department condoned its officers' actions. Former RPD Chief Singletary praised RPD officers, saying publicly that they "showed restraint" when many peaceful demonstrators, including elected officials, were shot in the head with pepper balls, pepper sprayed, and worse. RPD Deputy Chief Mark Mura declared that the tactics RPD officers used were "tactful, *per policy and training*, and appropriate for the situation at hand." Former Mayor Lovely Warren also praised RPD officers: "[Y]ou made us very, very proud."

71.     The widespread use of pepper spray, pepper-balls, tear gas, and other types of "less lethal" weapons belies any claim that individual officers were acting on their own rather than implementing a preconceived municipal plan.

E.     **The Effects of Teargas and Other Chemical Weapons Was Known Prior to the September 2020 Protests**.

72.     After George Floyd was murdered on May 25, 2020, racial justice protests took place in cities across the county. Numerous police departments responded by using teargas and other chemical weapons against protesters.

73.     Immediately, protesters across the country reported that exposure to teargas and other chemical weapons caused menstrual irregularities.

74.     Throughout the summer of 2020, media outlets nationwide reported that protesters who were exposed to teargas and other chemical weapons were experiencing irregularities with their menstrual cycle. *See, e.g.*, Katie C. Reilly, *Police tear gas George Floyd protests despite proof it's dangerous. Time for a ban*, NBC News (June 11, 2020), https://www.nbcnews.com/think/opinion/police-tear-gas-george-floyd-protests-despite-proof-it-s-ncna1229516 (noting that, tear gas "has been linked to miscarriages"); Jennifer Gerson,

14

*Doctors Explain What You Should Know About Tear Gas & Your Period,* Bustle (June 17, 2020), https://www.bustle.com/p/can-tear-gas-affect-your-period-doctors-explain-what-to-know-22987529; Nicole Wetsman, *There isn't enough research to know if tear gas causes early periods: it's dangerous regardless*, The Verge (June 22, 2020), https://www.theverge.com/2020/6/22/21295159/tear-gas-menstural-cycle-miscarriage-period-protests; Dhruvi Chauhan, Paula Kibuka Musoke, and Goleen Samari, *Using tear gas on protesters perpetuates patterns of reproductive harm*, The Hill (June 26, 2020), https://thehill.com/opinion/healthcare/504699-using-tear-gas-on-protesters-perpetuates-patterns-of-reproductive-harm; Cecilia Nowell, *Protesters Say Tear Gas Caused Them to Get Their Period Multiple Times in a Month*, Teen Vogue (July 2, 2020), https://www.teenvogue.com/story/protestors-say-tear-gas-caused-early-menstruation; Alexandria Herr, Can tear gas mess with your period? Grist (Jul. 17, 2020), https://grist.org/justice/can-tear-gas-mess-with-your-period/; Rebecca Ellis, *'It's like they're testing it on us': Portland protesters say tear gas has caused irregularities with their periods*, OPB (July 29, 2020), https://www.opb.org/article/2020/07/29/tear-gas-period-menstrual-cycle-portland/. *Police are using tear gas, but lack of study and oversight raises health concerns,* Associated Press (Aug. 6, 2020), https://www.oregonlive.com/news/2020/08/police-are-using-tear-gas-but-lack-of-study-and-oversight-raises-health-concerns.html; Abe Asher, *Irregular Periods and Horrible Headaches: How Tear Gas Is Making Portland Sick*, VICE (Aug. 14, 2020), https://www.vice.com/en/article/4ay5mn/an-endless-barrage-of-tear-gas-is-making-portland-sick; Catherine Ryan Gregory, *Tear Gaslighting: Is There a Link Between Protesting and Messed Up Periods?* Marie Claire (Aug. 21, 2020), https://www.marieclaire.com/health-fitness/a33648135/tear-gas-effects-reproductive-system/.

75.     Thus, for months prior to the September 2020 protests, Defendants had clear notice that the use of teargas and other chemical weapons causes damage to women's reproductive health, including menstrual irregularities and miscarriages.

76.     Nevertheless, Defendants ignored these warnings and made tear gas, pepper balls and other chemical weapons the centerpiece of their coordinated protest response plan.

77.     Pursuant to policy, on the night of September 5-6, 2020, RPD officers and/or Sheriff's Deputies attacked Ms. WOODWARD with chemical weapons. As a result, upon information and belief, Ms. WOODWARD suffered severe menstrual irregularities and inferetitly.

F.     **Unlawful Municipal Policies and Negligence of the City And RPD in Failing to Properly Train RPD Officers On The Proper Handling of First Amendment Assemblies, and In Failing to Supervise and Discipline Officers Who Used Excessive Force Against Protesters**.

78.     Since at least the 2009, the RPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, including peaceful protests and lawful demonstrations.

79.     Upon information and belief, the core training provided by the CITY related to protest response is based on crowd management and disorder control tactics for policing large-scale civil disorders and riots.

80.     According to the CITY's website, the RPD's Mobile Field Force (MFF) is a "specially trained and equipped team providing a rapid, organized and disciplined response to civil disorder [and] crowd control."

81.     The MFF was the RPD's primary unit tasked with policing the peaceful protests in the wake of George Floyd and Daniel Prude in May and September 2020, respectively, and on the night of September 4-5, 2020 specifically.

82.     Upon information and belief, the MFF's training and guidelines treat peaceful protests and peaceful demonstrations as military engagements and copies military tactics and focus on tactics designed to deter, disperse, and demoralize groups, such as disorder control formations and mass use of chemical weapons.

83.     Such disperse and demoralize tactics have persisted through the present as exemplified by the experiences of Mx. MARING.

84.     Upon information and belief, the MFF's "civil disorder" training and guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations—only for large-scale civil disorders such as riots.

85.     However, neither the MFF's "civil disorder" training and guidelines, nor, upon information and belief, any related RPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

86.     For example, upon information and belief, there is virtually no RPD training— and certainly no meaningful RPD training—focusing on how to utilize the tactics described in the MFF's "civil disorder" training and guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

87.     Many MFF members have histories of engaging in the kinds of misconduct complained of herein, among other places, by CRB complaints, PSS investigations and in lawsuits.

17

88.     Examples of the RPD's unreasonable and discriminatory use of force at prior lawful protests include:

- In October 2009, an anti-war protest in Rochester resulted in several physical confrontations, with two protesters receiving stitches at the hospital after RPD officers pushed them face-first to the ground, and 12 protesters arrested for exercising their First Amendment rights. The peaceful march, held in the early evening, was interrupted by approximately forty RPD vehicles. Within three minutes of giving the order to disperse, RPD officers began to shove and hit protesters with clubs and deploy pepper spray. Protesters described RPD officers wading through the crowd to pick out Black students to arrest. A press videographer who was filming one such arrest was wrestled to the ground by police and himself arrested.

- In May 2015, Katrina Perkins was protesting police brutality on a public street in a residential neighborhood, where two of her daughters and six of her grandchildren reside. Though Ms. Perkins was peacefully demonstrating, RPD officers violently seized and arrested her and then charged her with disorderly conduct and disruption. Those charges were dismissed two months later. Police brutality is a deeply personal issue to Ms. Perkins, as her daughter Lashedica was the 13-year-old shot three times by former-Deputy Chief Simmons in 2005.

- In July 2016, in Rochester as across the nation, people took to the streets to uphold the sanctity of Black lives and call for an end to racist policing. In response, the RPD deployed, beat, shoved, and pepper sprayed protesters. As one described it: "I started to turn and they tackled me to the ground.…They're beating citizens for no reason whatsoever. I wasn't doing anything. I was taking pictures." RPD officers, in keeping

with their pattern and practice, particularly targeted Black protesters with unlawful force, including Black journalists: Carlet Cleare and Justin Carter of WHAM-TV were both handcuffed and detained, even though Ms. Cleare was wearing a WHAM-TV shirt and they identified themselves as members of the press. Over the course of one weekend, Rochester had more arrests at its BLM protest (74) than the rest of the nation combined.

89.     Despite the wealth of evidence of RPD members' historical brutality against protesters, Defendant City has ignored, and/or failed to utilize, relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in RPD training as it relates to constitutionally compliant protest policing.

90.     In fact, following the 2016 protest, the RPD and Mayor Lovely Warren's office stated the police handled themselves appropriately.

91.     When questioned by public officials after the September 2020 protests, former RPD Chief La'Ron Singletary stated that he did not review the RPD's actions at the 2016 protest in developing the RPD's strategy for responding to protests in 2020.

92.     The City and RPD's failure to train and improper training led to widespread excessive force at the 2020 protests, as demonstrated by RPD officers body worn camera videos, media reports, and RPD subject resistance reports.  However, Based on statements by City Officials and RPD command staff to date, and publicly available information, no RPD officer has reported any fellow officer for their unlawful use of force and no RPD officers have been disciplined for their unlawful use of force on September 2, 3, 4 or 5, 2020.

93.     The City and RPD did not simply ratify excessive force through the lack of reporting and discipline. It approved the force during the demonstrations because its policies

authorized these excessive levels of force. RPD training on grenadier, MFF, and crowd control tactics, as well as its subject resistance reports, show that tear gas, pepper spray, projectiles, and grenades were supplied by superiors and deployed on their orders pursuant to RPD policies on use for force. There appears to have been no consideration given to whether such force would be excessive to secure compliance with traffic laws or enforce violations or misdemeanors against nonviolent protestors.

94.     In summary, upon information and belief, the RPD's exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests—despite having received clear notice that RPD policing of protests has caused the systemic violations of protesters' constitutional rights for years—demonstrates the City's negligence in failing to train and supervise RPD Officers in properly and lawfully policing protests to ensure that protesters' rights under the First Amendment, Fourth Amendment, Fourteenth Amendment, and other, related rights are not violated. As a result of the City's negligence, Plaintiff was injured and harmed, as described herein.

G. **Unlawful Municipal Policies and Negligence of the COUNTY and Sheriff BAXTER in Failing to Properly Train Sheriff's Deputies On The Proper Handling of First Amendment Assemblies, and In Failing to Supervise and Discipline Sheriff's Deputies Who Used Excessive Force Against Protesters**.

95.     Prior to September 2020, the COUNTY and BAXTER had received clear notice that peaceful protests and lawful demonstrations have occurred and will continue to occur in Monroe County, and that without proper training, his Deputy Sheriffs would violate individuals' constitutional rights and endanger the life and safety of protesters, such as Plaintiff.

96.     The COUNTY and BAXTER deliberately disregarded the fact that peaceful protests and peaceful demonstrations have occurred and will continue to occur in Monroe

County, and instead has trained his Deputies that such lawful First Amendment activities constitute "civil disturbances" that mut be policed in the same manner as "violent mobs" or "riots."

97.     The COUNTY and BAXTER, upon information and belief, took no steps to train Sheriff's Deputies on lawfully policing protests and other First Amendment activities.

98.     Instead, the COUNTY and BAXTER, trained Sheriff's Deputies to respond to First Amendment assemblies pursuant to the County's Hazard Mitigation Plan, which defines a "civil disturbance" as both "peaceful demonstrations or acts of violence."

99.     Upon information and belief, the Hazard Mitigation Plan was in full force and effect at all times relevant herein.

100.    Upon information and belief, prior to 2020 and at all times relevant herein, the COUNTY and BAXTER had implemented the Hazard Mitigation Plan, and trained Sheriff's Deputies in accordance with its mandates. Thus, the COUNTY and BAXTER explicitly conflate peaceful protests and peaceful demonstration with violent riots.

101.    Upon information and belief, the COUNTY and BAXTER did not provide any training to Sheriff's Deputies on drawing a meaningful distinction between "peaceful demonstrations" and "violent mobs". For example, in its "Hazard Mitigation Plan," the County states that, "Many civil unrest incidents are spontaneous and can occur at any time, rendering prediction of probability of future occurrences difficult. When these incidents occur, they can become extremely disruptive and difficult to control. Assumedly, civil unrest incidents including marches, protests, demonstrations, and gatherings will continue to occur throughout Monroe County."

102.    According to the Hazard Mitigation Plan, peaceful protests and demonstrations are discouraged because of the perceived negative impacts on property resources, real estate and the economy.

103.    Upon information and belief, the COUNTY and BAXTER do not provide any training to Sheriff's Deputies on how to encourage and support individuals engaging in "peaceful demonstrations" to ensure that their constitutional rights are not violated by law enforcement officers.

104.    Upon information and belief, the COUNTY and BAXTER do not provide any training to Sheriff's Deputies on making a meaningful distinction between how Sheriff's Deputies are trained and instructed on policing "peaceful demonstrations", "peaceful protests" versus "violent mobs" and riots.

105.    Instead, the Hazard Mitigation Plan states that, "[m]any protests intended to be peaceful demonstrations to the public and the government can escalate into general chaos."

106.    Upon information and belief, the COUNTY and BAXTER train Sheriff's Deputies to police peaceful demonstrations in the same manner as they would a violent mob.

107.    Like the RPD, upon information and belief, BAXTER trains Sheriff's Deputies exclusively on deterring, dispersing, and demoralizing protests and peaceful demonstrations.

108.    In June 2020, several Monroe County Legislators called on BAXTER to implement new protest training to ensure the safety of protesters at Black Lives Matter demonstrations. The legislators drafted a letter to County Executive Adam Bello and BAXTER in which they made a number of requests related to public safety and the safety of protesters, and closed by stating, "Once again, we believe the safety of both protesters, motorists, and law enforcement is of the utmost importance. Right here in Monroe County and across the Nation,

we have seen the negative results when leaders are reactionary rather than proactive. Please be sure that a plan is in place to ensure the mutual safety of all involved."

109.     BAXTER claimed the letter was a "political stunt" and refused to provide any specific details regarding how Sheriff's Deputies would ensure the safety of protesters during peaceful demonstrations

110.     As a result of the COUNTY's unlawful policies, practices and customs, and BAXTER's negligence, Plaintiff was injured and harmed, as described herein.

### H.  Ms. WOODWARD's September 16, 2020 Arrest.

111.     On the night of September 15-16, 2020, Free the People ROC organized a peaceful "sleep-in" protest in front of City Hall. In the morning, protesters awoke to police getting into formation and issuing dispersal orders.

112.     Ms. WOODWARD did not attend the "sleep-in", but went to the protest in the morning at approximately 9:00 a.m.

113.     When Ms. WOODWARD arrived, the police had formed a line and were facing off with protesters on Church Street in front of City Hall.

114.     Ms. WOODWARD joined the line of protesters on the edge of the street in the bike lane.

115.     Approximately five minutes after Ms. WOODWARD arrived, five RPD officers, including SCHIFFMAN, ARROWOOD and BURGSTROM seized and arrested her:



116.    The RPD officers pushed Ms. WOODWARD's wheelchair to the corner of

Church Street and Fitzhugh Street, and detained her on the street corner.

117.    SCHIFFMAN was assigned to detain Ms. WOODWARD.

118.    SCHIFFMAN, ARROWOOD and BURGSTROM and other officers called their

supervisors and informed them that they did not know how to transport Ms. WOODWARD to

PSB, and that they were not expecting to arrest a wheelchair user.

119.    Ms. WOODWARD immediately informed SCHIFFMAN, ARROWOOD,

BURGSTROM and other RPD officers that she would eventually have to urinate, and that part of

her disability is that she is unable to hold it for long periods of time. Thus, when she felt the urge

to urinate, she would have to go immediately, or she would urinate on herself.

120.    SCHIFFMAN, ARROWOOD, BURGSTROM and other officers discussed the

possibility of lifting Ms. WOODWARD out of her wheelchair and placing her into a regular

transport vehicle.

121.    The other protesters were that were arrested who do not use wheelchairs were all placed in MCSO transportation vans and transported to the PSB, where they were able to use the bathroom.

122.    Ms. WOODWARD was detained on the sidewalk at the corner of Church Street and Fitzhugh Street for approximately two hours.

123.    Throughout the two hours that she was detained on the sidewalk, Ms. WOODWARD repeatedly informed SCHIFFMAN, ARROWOOD, BURGSTROM and other RPD officers that she had to urinate, but they did not permit her to use the bathroom.

124.    As a result, Ms. WOODWARD urinated on herself.

125.    Eventually, Ms. WOODWARD was given an appearance ticket and told she could leave.

126.    RPD officers were unable to transport Ms. WOODWARD to the PSB, where she could have used the bathroom, because they do not have any wheelchair accessible vehicles. This constituted a failure to accommodate Ms. WOODWARD's disability.

127.    During her encounter with the RPD on September 16, 2020, Ms. WOODWARD repeatedly experienced discrimination, indignity, inaccessibility, and services that were not adequate to accommodate, protect, or ensure the safety of a person who uses a wheelchair.

**I.    The RPD has a Pattern and Practice of Failing to Accommodate Arrestees or Detainees Who Use Wheelchairs During Transports.**

128.    The City of Rochester routinely fails to provide appropriate and accessible vehicles when a person who uses a wheelchair is arrested, detained, or transported by RPD personnel. The City also fails to offer adequate training and policies or procedures to govern situations where a person who uses a wheelchair is arrested and needs to be transported.

129.    The City of Rochester does not have a written anti-discrimination policy concerning how RPD personnel are to appropriately interact with and accommodate people who use wheelchairs when they are arrested and need to be transported.

130.    The City of Rochester does not have any wheelchair accessible vans within the fleet of vehicles the RPD uses to transport arrestees or detainees.

131.    Accessible vans for wheelchair users have features such as very wide doors, ramps on a safe slope into the vehicle, barriers on the sides of the ramp to ensure stability, and devices to secure the person inside the van.

132.    Publicly available information chronicles numerous instances of the RPD's unsafe interactions with people who use wheelchairs. These incidents demonstrate the City of Rochester's pervasive pattern and practice of providing physically inaccessible RPD services and facilities, as well as insufficient training and policies and procedures for RPD personnel.

133.    For example, on May 1, 2013, RPD officers Joseph Ferrigno and Anthony Liberatore unlawfully ordered 52-year-old Benny Warr to disperse from the location where he was waiting for a public bus. Mr. Warr is a one-leg amputee and wheelchair user, and when he explained that he was waiting for the bus, they threw him out of his wheelchair, beat and arrested him. Upon information and belief, the RPD had Mr. Warr transported by ambulance because they lacked any wheelchair accessible transport vehicles.

134.    Moreover, in *Warr*, the defendant police officers testified that they had no training on how to lawfully arrest a wheelchair user.

135.    On June 28, 2017, Ms. WOODWARD and numerous other wheelchair users were arrested while protesting proposed cuts to Medicaid at the Monroe County Republican Office in downtown Rochester. Numerous RPD officers and former RPD Chief Michael Ciminelli arrived

at the arrest location and discussed how they had no way to transport the wheelchair users to the PSB for arrest processing. Ciminelli and Locust Club President Mike Mazzeo spent time negotiating the arrest procedure. Eventually, Chief Ciminelli decided that the wheelchair users would be taken next door to the Center for Disability Rights, where they were booked and issued appearance tickets. Upon information and belief, the reason that the protesters were not transported to the PSB for arrest processing is because approximately 10-15 wheelchair users were arrested and the RPD had no wheelchair accessible transport vehicles. Upon information and belief, if the group had not included wheelchair users, they would have been transported via RPD vehicles to the PSB for booking and processing.

136.    Similarly, on September 4, 2020, at a Daniel Prude protest on the Court Street Bridge, RPD officers attacked a wheelchair user named Christopher Hilderbrant, threw him from his wheelchair to the ground, repeatedly struck him and then dragged him approximately 10 feet across the pavement. Mr. Hilderbrant was arrested; but like Ms. WOODWARD, because the RPD lacks wheelchair accessible vehicles, Mr. Hilderbrant was not placed in a transport vehicle. Instead, Mr. Hilderbrant was wheeled from the Court Street Bridge to PSB. After unlawfully detaining him for several hours, the RPD officers decided to let him go without charging him with a crime. Upon information and belief, the RPD officers released him without charging him with a crime solely because of his disability.

137.    Numerous other protesters who are not wheelchair users were arrested on September 4, 2020 and transported to the PSB. Most of them, such as Masai Andrews, were loaded into transportation vehicles and driven to the PSB. The other protesters were charged with crimes by the RPD, given appearance tickets and released, unlike Mr. Hilderbrant.

138.    Mr. Hilderbrant's arrest put the RPD on notice prior to the September 16, 2020 protest that wheelchair users were not only attending the Daniel Prude protests but were being arrested by the RPD and that the RPD needed to have wheelchair accessible transportation vehicles at protests.

139.    Upon information and belief, there are numerous other incidents in which the RPD's discriminatory conduct violated the protections afforded to people who use wheelchairs under the ADA, Section 504, other federal and state anti-discrimination laws, and the United States Constitution.

140.    These incidents, together with Ms. WOODWARD's encounter with the RPD on September 16, 2020, demonstrate that the RPD is not in compliance with federal and state law, routinely discriminates against people who use wheelchairs, and fails to provide accommodations for wheelchair users.

141.    The City of Rochester has failed to implement RPD training, practices, policies, and procedures that accommodate and ensure the safety of people who use wheelchairs when they encounter the RPD and require transport.

142.    However, despite this knowledge, the City of Rochester has failed to adopt training, policies, practices, and procedures sufficient to accommodate and safely arrest, transport and detain people who use wheelchairs in a way that accounts for their disabilities and is not discriminatory.

### V.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
#### Municipal Liability
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's First, Fourth and Fourteenth Amendment Rights*
#### (Against the City)

143.    All preceding and subsequent paragraphs are incorporated by reference.

144.    All of the wrongful acts or omissions complained of herein against Plaintiff and other protesters were carried out by the individually named and unnamed RPD officers pursuant to: (a) formal policies, rules, and procedures of Defendant CITY; (b) actions and decisions by Defendant CITY's policymaking agents; (c) customs, practices, and usage of the RPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by CITY policymaking officials; (d) Defendant CITY's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the CITY's failures, and the failures of the other policymaking agents, to train, supervise, and discipline RPD officers, despite full knowledge of the their wrongful acts against Plaintiff and other protesters, as described herein.

145.    As a result of the foregoing, Plaintiff suffered injuries and damages.

## SECOND CLAIM FOR RELIEF
### Municipal Liability and Supervisory Liability

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' First, Fourth and Fourteenth Amendment Rights During the Summer and Fall 2020 Racial Justice Protests***
**(Against the COUNTY and BAXTER)**

146.    All preceding and subsequent paragraphs are incorporated by reference.

147.    All of the wrongful acts or omissions complained of herein against Plaintiff and other protesters were carried out by the individually named and unnamed MCSO employees and/or Sheriff's Deputies pursuant to: (a) formal policies, rules, and procedures of Defendants COUNTY and BAXTER; (b) actions and decisions by policymaking agents of the COUNTY and MCSO, including, but not limited to, Defendant BAXTER; (c) customs, practices, and usage of the MCSO that are so widespread and pervasive as to constitute de facto policies accepted,

encouraged, condoned, ratified, sanctioned, and/or enforced by Defendants COUNTY, MCSO and BAXTER, and other policymaking officials; (d) Defendant COUNTY, MCSO and BAXTER's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by their failures, and the failures of the other policymaking agents, to train, supervise, and discipline MCSO employees and/or Sheriff's Deputies, despite full knowledge of their wrongful acts Plaintiffs and other protesters, as described herein.

148.    BAXTER, through his conduct in developing and implementing the COUNTY's unlawful policies for responding to the protests, caused the violation of Plaintiff's rights at the September 2020 protests.

149.    As a result of the foregoing, Plaintiff suffered injuries and damages.

## THIRD CLAIM FOR RELIEF
### Excessive Force
### *Pursuant to 42 U.S.C. § 1983*

150.    All preceding and subsequent paragraphs are incorporated by reference.

151.    The actions of the John Doe RPD officers and Richard Roe Sheriff's Deputies towards Plaintiff on September 5-6, 2020 constitute excessive force in violation of 4th and 14th Amendments of the United States Constitution and 42 U.S.C. § 1983.

152.    Defendants used force against Ms. WOODWARD that was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted them.

153.    The force used against Ms. WOODWARD on September 5-6, 2020 constituted a seizure under the Fourth Amendment.

154.    It was objectively unreasonable for the RPD Officers and/or Sheriff's Deputies to use military grade weapons, "less-than-lethal" weapons, and chemical weapons against Ms. WOODWARD on September 5-6, 2020, without first having made an individualized determination that it was reasonable to use any force Ms. WOODWARD based on her own individual conduct, instead of any perceived "group conduct." This conduct constitutes a seizure under the 4th Amendment.

155.    It was objectively unreasonable for RPD officers and/or Sheriff's Deputies to shoot Ms. WOODWARD in the back of her shoulder as she was wheeling away from officers and attempting to disperse from the area.

156.    The types and levels of force Defendants used against Ms. WOODWARD were in contravention of, or inconsistent with, related policies and/or training.

157.    As a result of the acts and omissions of the RPD officers and/or Sheriff's Deputies, Defendants deprived Ms. WOODWARD of her federal, state, and/or other legal rights; caused Ms. WOODWARD bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Ms. WOODWARD to expend costs and expenses; has prevented Ms. WOODWARD from becoming pregnant; and/or otherwise damaged and injured Ms. WOODWARD.

158.    The actions of the RPD officers and Sheriff's Deputies were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

159.    As a result of the foregoing, Plaintiff suffered injuries and damages.

## FOURTH CLAIM FOR RELIEF
### Assault and Battery
*Pursuant to New York State Law.*

160.    All preceding and subsequent paragraphs are incorporated by reference.

31

161.    RPD Officers and/or Sheriff's Deputies intentionally used military grade weapons, "less-than-lethal" weapons, and chemical weapons against Ms. WOODWARD on September 5-6, 2020 without first having made an individualized determination that it was reasonable to use any force against Plaintiff based on her own individual conduct, instead of any perceived "group conduct."

162.    RPD Officers and/or Sheriff's Deputies intentionally shot Ms. WOODWARD in the back as she was wheeling away from them and attempting to disperse from the area.

163.    The types and levels of force Defendants used against Ms. WOODWARD were in contravention of, or inconsistent with, related policies and/or training.

164.    Ms. WOODWARD was not threatening the law enforcement officers or any other person at any time.

165.    By the aforedescribed conduct, defendants, their agents, servants and employees, acting within the scope of their employment, intentionally, willfully and maliciously battered Plaintiff Ms. WOODWARD, when they, in a hostile and/or offensive manner struck Plaintiff—including by subjecting her to tear gas and other chemicals—without her consent and with the intention of causing harmful and/or offensive bodily contact to the Plaintiff and caused such battery.

166.    The RPD Officers were at all times agents, servants, and employees acting within the scope of their employment by the Defendant CITY and the RPD, which are therefore responsible for their conduct.

167.    The Defendant CITY, as the employer of the individual RPD defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

168.     At no point during the incidents described herein did the circumstances necessitate or support the above applications of force utilized by the defendant RPD officers and/or Sheriff's Deputies against Plaintiff.

169.     The actions of the RPD officers and Sheriff's Deputies were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

170.     As a result of the foregoing, Plaintiff suffered injuries and damages.

### FIFTH CLAIM FOR RELIEF
**First Amendment Infringements, Including First Amendment Retaliation**
***Pursuant to 42 U.S.C. § 1983***

171.     All preceding and subsequent paragraphs are incorporated by reference.

172.     In committing the acts and omissions complained of herein, Defendants acted under color of state law—individually, in concert, and through a conspiracy—to deprive Plaintiff of the rights protected by the First Amendment to the United States Constitution.

173.     Defendants (a) retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment, and (b) imposed restrictions on such protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to, in arresting Plaintiff, in subjecting Plaintiff to excessive force, in selectively enforcing laws and regulations against Plaintiff, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

174.     Defendants engaged in those and other acts and omissions complained of herein in retaliation for Plaintiff's protected speech and/or conduct.

175.     Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

176.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar protected conduct in the future.

177.    As a result of Defendants' actions, Plaintiff's speech was chilled.

178.    The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

179.    As a result of the foregoing, Plaintiff suffered injuries and damages.

<strong><u>SIXTH CLAIM FOR RELIEF</u></strong><br><strong>Failure To Intervene</strong><br><strong><em>Pursuant to 42 U.S.C. § 1983</em></strong>

180.    All preceding and subsequent paragraphs are incorporated by reference.

181.    The individual defendants all had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of her constitutional rights by the other Defendant RPD officers.

182.    The individual defendants failed to intervene on Plaintiff's behalf despite having had realistic opportunities to do so.

183.    The individual defendants failed to intervene on Plaintiff's behalf despite having substantially contributed to the circumstances within which Plaintiff's rights were violated by their affirmative conduct.

184.    As a result of the aforementioned conduct of the individual defendants, Plaintiff's constitutional rights were violated.

185.    Defendants' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

186.    As a result of the foregoing, Plaintiff suffered injuries and damages.

**SEVENTH CLAIM FOR RELIEF**
**Negligent Training, Supervision and Discipline**
**(Against BAXTER)**

187.    All preceding and subsequent paragraphs are incorporated by reference.

188.    Defendant BAXTER was negligent in the training, supervision and discipline of the Defendant Sheriff's Deputies, who were provided, upon information and belief, no training for policing protests, engaging in peaceful crowd control, or how to properly and safely use the "less lethal" weapons.

189.    Alternatively, the training BAXTER provided to the Sheriff's Deputies was inadequate.

190.    Moreover, despite their use of extreme and excessive violence against protesters on September 2-6, 2020, BAXTER was negligent in failing to supervise or discipline any of his Sheriff's Deputies related to any force used protesters on those nights prior to Plaintiff's injury. BAXTER's negligence was the direct and proximate cause of Plaintiff's injuries.

191.    BAXTER's negligence in failing to supervise and discipline his Sheriff's Deputies was the direct and proximate cause of Plaintiff's injuries.

192.    As a result of the foregoing, Plaintiff suffered injuries and damages.

**EIGHTH CLAIM FOR RELIEF**
**Negligent Planning of the Protest Response**
**(Against BAXTER)**

193.    All preceding and subsequent paragraphs are incorporated by reference.

194.    Defendant BAXTER was negligent in planning the response of his Sheriff's Deputies to the protests.

195.    BAXTER had a special duty to ensure that the rights of Plaintiff and other protesters to free speech, expression and to assemble under the First Amendment to the United

States Constitution, and Article I, section 8 of the New York State Constitution, were not

violated, and that protesters were not assaulted, battered, subjected to excessive force and/or

falsely arrested by law enforcement.

196.     BAXTER breached his duty to keep demonstrators safe by, among other things,

implementing a protest response plan that instructed his Sheriff's Deputies that Black Lives

Matter protests are led by a nationwide conspiracy of outside agitators bent on violence; this

manifested in the training of Sheriff's Deputies that what seem to be peaceful demonstrators are

a shield deliberately sent to the front lines to screen the throwing of objects from the rear. That

training conveniently justifies and encourages suppressing all protestors by collectively

punishing nonviolent ones. The message to their officers was clear: there is no such thing as a

peaceful protestor.

197.     BAXTER breached his duty to Plaintiff and other protesters by implementing a

protest response plan that violated the rights to free speech, expression and to assemble.

198.     BAXTER breached his duty to Plaintiff and other protesters by implementing a

protest response plan that conflated peaceful protests and demonstrations with violent mobs and

riots; thus, BAXTER knew or should have known that in the absence of a proper protest

response plan, his Sheriff's Deputies would use unreasonable and excessive force against

peaceful demonstrators, like Plaintiff.

199.     BAXTER breached his duty to Plaintiff and other protesters by implementing a

protest response plan that instructed his Sheriff's Deputies to use chemical weapons against

protesters; however, based on national news reports in the months before the September protests,

BAXTER knew or should have known that exposure to chemical weapons such as pepper balls,

tear gas and OC spray can cause serious adverse health effects, including menstrual irregularities.

200.    BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to police peaceful demonstrations in the same manner as they would police violent mobs.

201.    BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to use chemical weapons indiscriminately against protesters.

202.    BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to that they could shoot pepper balls and other "less-than-lethal" projectiles at protesters' heads.

203.    BAXTER breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed his Sheriff's Deputies to use "less-than-lethal" weapons and chemical weapons against "groups" of protesters based on perceived "group conduct", without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

204.    Plaintiff's injuries were a direct and proximate result BAXTER negligently planning the response to the protests.

205.    As a result of the foregoing, Plaintiff suffered injuries and damages.

### NINTH CLAIM FOR RELIEF
**Negligent Planning of the Protest Response**
**(Against the CITY)**

206.    All preceding and subsequent paragraphs are incorporated by reference.

207.    The CITY and RPD were negligent in planning the response to the protests.

208.    The CITY had a special duty to ensure that the rights of Plaintiff and other protesters to free speech, expression and to assemble under Article I, section 8 of the New York State Constitution were not violated, and that protesters were not assaulted, battered, subjected to excessive force and/or falsely arrested by law enforcement.

209.    For months before the body worn camera video of RPD officers brutally killing Daniel Prude was released, the CITY and RPD anticipated and planned for large-scale protests when the video was eventually released. During those several months—from at least June 4, 2020 to September 2, 2020—the CITY and RPD developed a protest response plan that included responding to peaceful protests with extreme violence; using military-grade weapons against protesters; using overwhelming amounts of chemical weapons against groups of protesters, without making individualized determinations that probable cause existed to believe that any individual within the group had committed a crime or violation; and otherwise to retaliate against protesters based on their objection to the message protesters were expressing.

210.    The CITY and RPD breached its duty to Plaintiff and other protesters by failing to implement any plan whatsoever for how to ensure that RPD officers protected and promoted protesters rights to free speech, expression and to assemble under Article I, section 8 of the New York State Constitution, and the New York Right to Monitor Act.

211.    The City and RPD breached its duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed RPD officers that Black Lives Matter protests are led by a nationwide conspiracy of outside agitators bent on violence; this manifested in the training of RPD officers that what seem to be peaceful demonstrators are a shield deliberately sent to the front lines to screen the throwing of objects from the rear. That training conveniently justifies and encourages suppressing all protestors by collectively

punishing nonviolent ones. The message to their officers was clear: there is no such thing as a peaceful protestor.

212.    The CITY and RPD breached its duty to Plaintiff and other protesters by implementing a protest response plan that affirmatively violated protesters' rights to free speech, expression and to assemble under First Amendment of the United States Constitution and Article I, section 8 of the New York State Constitution, and the New York Right to Monitor Act.

213.    The CITY and RPD breached its duty to Plaintiff and other protesters by implementing a protest response plan that instructed its officers to use extreme violence, militarized police tactics, military-grade weapons, and chemical weapons against protesters.

214.    The CITY knew or should have known that its protest plan was unlawful and that implementation of its plan would cause protesters rights to free speech, expression and to assemble under the First Amendment of the United States Constitution and Article I, section 8 of the New York State Constitution to be violated; and that RPD officers and other law enforcement officers would cause serious injuries to protesters.

215.    The CITY and RPD knew that at past protests, numerous RPD officers had seriously injured peaceful demonstrators; and that in the absence of a proper protest response plan, RPD officers would use unreasonable and excessive force against peaceful demonstrators and falsely arrest them.

216.    The CITY knew or should have known that exposure to chemical weapons such as pepper balls, tear gas and OC spray can cause serious adverse health effects—as same had been widely reported around the county in the months prior to the RPD's use of said chemical weapons in September 2020.

217.   The CITY breached his duty to keep demonstrators safe by, among other things, failing to implement a lawful protest response plan, and instead training RPD officers to police peaceful demonstrations in the same manner as they would police violent mobs or riots.

218.   The CITY breached its duty to keep demonstrators safe by implementing a protest response plan which, among other things, instructed RPD officers to use chemical weapons against protesters in the absence of individualized probable cause – despite knowing of the serious adverse health effects such chemical weapons would cause.

219.   The CITY breached its duty to keep demonstrators safe by, among other things, implementing a protest response plan that instructed RPD officers to use "less-than-lethal" weapons and chemical weapons against "groups" of protesters based on perceived "group conduct", without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

220.   The CITY breached his duty to keep demonstrators safe by, among other things, implementing a protest response plan that failed to properly instruct RPD officers on their duty to intervene to prevent the violation of protesters rights by other RPD officers, Sheriff's Deputies, and/or other law enforcement officials.

221.   The CITY breached his duty to keep demonstrators safe by implementing a protest response plan that caused the violation of Plaintiff's rights in all other ways detailed herein.

222.   Plaintiff's injuries were a direct and proximate result of the CITY's implementation of its negligent a protest response plan.

223.   As a result of the foregoing, Plaintiff suffered injuries and damages.

**TENTH CLAIM FOR RELIEF**
**Negligence**
**(Against the Individual Defendants)**

224.    All preceding and subsequent paragraphs are incorporated by reference.

225.    The Defendant RPD officers and Sheriff's Deputies, their agents, servants, employees, officers and deputies were negligent using the "less lethal" military grade weapons and chemical weapons against Plaintiff, which was the direct and proximate cause of Plaintiff's injuries sustained on September 5-6, 2020.

226.    The Defendant RPD officers and Sheriff's Deputies had a duty to permit the protesters to engage in First Amendment Activities and to protect them from harm or physical violence.

227.    The Defendant RPD officers and Sheriff's Deputies had a duty to not use force against any individual protester in the absence of individualized cause or legal justification for the use of force.

228.    The Defendant RPD officers and Sheriff's Deputies breached that duty by firing "less lethal" munitions and chemical weapons into "groups" of protesters based on perceived "group conduct," without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

229.    The breach of that duty by the Defendant RPD officers and Sheriff's Deputies was the direct and proximately cause of Ms. WOODWARD's serious injuries described herein.

230.    Defendant RPD officers and/or Sheriff's Deputies' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

41

231.    Accordingly, Plaintiff was harmed as a direct result of Defendants' unlawful conduct and is entitled to damages, injunctive relief, and reasonable attorney's fees and costs in an amount to be determined by the Court.

### ELEVENTH CLAIM FOR RELIEF
**Discrimination in violation of Title II of the Americans with Disabilities Act Pursuant to 42 U.S.C. § 12132 *et seq*.**

**(Against the CITY and COUNTY)**

232.    All preceding and subsequent paragraphs are incorporated by reference.

233.    Under Title II of the ADA, it is illegal for public entities to discriminate against qualified individuals with disabilities. Under 42 U.S.C. § 12132, "no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity."

234.    At all times relevant to this action, Ms. WOODWARD has been paralyzed from the waist area down and has required a wheelchair for mobility.

235.    Ms. WOODWARD is a "qualified individual with a disability" under the ADA because her paralysis "substantially limits one or more major life activities," as defined by 42 U.S.C. § 12102(2).

236.    Defendant City of Rochester is a "public entity," as defined by 42 U.S.C. § 12131(1).

237.    Defendant County of Monroe is a "public entity," as defined by 42 U.S.C. § 12131(1).

238.    Defendant City of Rochester unlawfully discriminated against Ms.
WOODWARD in violation of the ADA by failing to accommodate Ms. WOODWARD'S
qualified disability during her arrest and detention.

239.    By refusing to provide accessible services, the RPD discriminated against Ms.
WOODWARD, adding an additional layer of punishment, injury, and indignity to the arrest and
detention processes on September 16, 2020 solely because of Ms. WOODWARD'S disability. A
person who does not have a disability would not otherwise have experienced this harm.

240.    By failing to provide wheelchair accessible transportation vehicles, the CITY and
COUNTY refused to provide accessible services and discriminated against Ms. WOODWARD,
adding an additional layer of punishment, injury, and indignity to the arrest and detention
processes on September 16, 2020 solely because of Ms. WOODWARD'S disability. The other
individuals arrested on September 16, 2020 who were not wheelchair users did not experience
this harm.

241.    Accordingly, Ms. WOODWARD was harmed as a direct result of Defendants'
unlawful and discriminatory conduct and is entitled to damages, injunctive relief, and reasonable
attorney's fees and costs in an amount to be determined by the Court.

### TWELFTH CLAIM FOR RELIEF
**Discrimination in violation of Section 504 of the Rehabilitation Act
(Title 29 U.S.C. § 794 *et seq.*)**

**(Against the CITY and COUNTY)**

242.    All preceding and subsequent paragraphs are incorporated by reference.

243.    Section 504 provides that it is illegal for "any program or activity receiving
Federal financial assistance" to subject any "qualified individual with a disability" to
discrimination under 29 U.S.C.A. § 794(a).

43

244.    At all times relevant to this action, Ms. WOODWARD has been paralyzed from the waist area down and has required a wheelchair for mobility.

245.    Ms. WOODWARD is thus a "qualified individual with a disability" under Section 504, as defined by 29 U.S.C.A. § 705(20) and 42 U.S.C.A. 12102(2).

246.    At all times relevant to this action, both Defendant City of Rochester and their agency, the RPD, received funding from the federal government of the United States and were "programs or activities," as defined by 29 U.S.C.A. § 794(b).

247.    Defendant City of Rochester unlawfully discriminated against Ms. WOODWARD in violation of Section 504 by failing to accommodate Ms. WOODWARD's qualified disability during her arrest, transport, and detention, by, inter alia, failing to maintain and/or provide wheelchair accessible transportation vehicles.

248.    At all times relevant to this action, both Defendant County of Monroe and their agency, the MCSO, received funding from the federal government of the United States and were "programs or activities," as defined by 29 U.S.C.A. § 794(b).

249.    Defendant County of Monroe unlawfully discriminated against Ms. WOODWARD in violation of Section 504 by failing to accommodate Ms. WOODWARD's qualified disability during her arrest, transport, and detention by failing to maintain and/or provide wheelchair accessible transportation vehicles.

250.    Furthermore, the RPD's conduct during Ms. WOODWARD's arrest and detention on September 16, 2020 added an additional layer of punishment and indignity that a person who does not have a disability would not otherwise experience.

251.    Accordingly, Ms. WOODWARD was harmed as a direct result of Defendants' unlawful and discriminatory conduct and is entitled to damages, injunctive relief, and reasonable attorneys' fees and costs in an amount to be determined by the Court.

**THIRTEENTH CLAIM FOR RELIEF**
**Discrimination in violation of New York State Human Rights Law**
**(New York Executive Law §§ 292 et seq. and the New York Civil Rights Law §§ 40 et seq.)**

**(Against City of Rochester, SCHIFFMAN, ARROWOOD and BURGSTROM)**

252.    All preceding and subsequent paragraphs are incorporated by reference.

253.    The NYSHRL provides that "it shall be unlawful discriminatory practice for any . . . place or provider of public accommodation" to discriminate against a person with a disability either directly or indirectly under N.Y. Exec. Law § 296(2)(a).

254.    At all times relevant to this action, Ms. WOODWARD has been paralyzed from the waist area down and has required a wheelchair for mobility.

255.    Ms. WOODWARD has a "disability" under N.Y. Exec. Law § 296(21) because she has multiple physical impairments to her body.

256.    Defendant City of Rochester, and their agency the RPD, are "persons" as defined by § 296(1), and "places and providers of public accommodation" as defined by § 296(9).

257.    Individual RPD defendants are agents and employees of a public accommodation.

258.    Defendant City of Rochester and all RPD officers unlawfully discriminated against Ms. WOODWARD by failing to accommodate her disability during her arrest and detention in violation of the NYSHRL.

259.    Furthermore, the RPD's conduct during Ms. WOODWARD's arrest and detention on September 16, 2020 added an additional layer of punishment and indignity that a person who does not have a disability would not otherwise experience.

260.     Accordingly, Ms. WOODWARD was harmed as a direct result of Defendants'

unlawful and discriminatory conduct and is entitled to damages, injunctive relief, and reasonable

attorney's fees and costs in an amount to be determined by the Court.

## FOURTEENTH CLAIM FOR RELIEF
**Municipal Liability for Policies, Practices and Customs of Discriminating Against
Wheelchair Users**
***Pursuant to 42 U.S.C. § 1983***

**(Against City of Rochester)**

261.     All preceding and subsequent paragraphs are incorporated by reference.

262.     Defendant City of Rochester has no written policy in place concerning how its

employees arrest, detain and transport people who use wheelchairs. In fact, the current RPD

General Orders provides officers with no guidance whatsoever regarding how to arrest, detain

and transport people who use wheelchairs.

263.     It was highly predictable that RPD personnel would encounter, arrest, detain and

need to transport people who use wheelchairs in Rochester. Consequently, Defendant City of

Rochester knew to a moral certainty that RPD personnel would encounter, arrest, detain and need

to transport people who use wheelchairs.

264.     It continues to be highly predictable that RPD personnel will encounter, arrest,

detain and need to transport people who use wheelchairs in Rochester. Consequently, Defendant

City of Rochester knows to a moral certainty that RPD personnel will continue to encounter,

arrest, detain and need to transport people who use wheelchairs.

265.     In fact, Defendant City of Rochester has notice of numerous complaints in which

RPD officers allegedly violated the rights of people who use wheelchairs during the arrest,

detention and transport; and/or were unable to transport wheelchair users due to the lack of

wheelchair accessible transport vehicles.

46

266.     Furthermore, Defendant City of Rochester knows that the RPD's policies and methods for the arrest, detention and transport of people who use wheelchairs are insufficient because there is a history of RPD officers having difficulty, mishandling, and failing to accommodate people who use wheelchairs during their arrest, detention and transport. Defendant City of Rochester has consequently long been aware that the RPD's failures would result, and will continue to result, in the deprivation of individual wheelchair users' constitutional and federal rights.

267.     Defendant City of Rochester's deliberate choice to ignore the known problems with RPD officers being unable to transport people who use wheelchairs, and the City of Rochester's failure to implement an adequate policy or practice to guide its officers in the RPD concerning how to arrest, detain and transport arrestees who use wheelchairs, resulted in the violation of Ms. WOODWARD's rights secured by the Fourth and Fourteenth Amendments and the ADA. The RPD's customs and practices for the arrest and detention of people who use wheelchairs, and its inability to transport people who use wheelchairs, are discriminatory and dangerous.

268.     The City of Rochester also failed to adequately train, monitor and supervise its employees regarding their constitutional and federal duty, despite the RPD's history of encounters with people who use wheelchairs and the predictability that RPD personnel would continue to encounter and need to transport people who use wheelchairs in Rochester.

269.     By permitting, tolerating and sanctioning a persistent and widespread policy, practice and custom pursuant to which Ms. WOODWARD was subjected to the conduct alleged herein, Defendant City of Rochester has deprived Ms. WOODWARD of rights, remedies, privileges and immunities guaranteed to every citizen of the United States secured by 42 U.S.C.

§ 1983, including but not limited to, rights guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution, the ADA, and other federal laws.

270.    Accordingly, Ms. WOODWARD was harmed as a direct result of Defendants' unlawful and discriminatory conduct and is entitled to damages, injunctive relief, and reasonable attorney's fees and costs in an amount to be determined by the Court.

WHEREFORE and in light of the foregoing, Plaintiff demands judgment on all claims for relief:

a.    Empanel a jury;

b.    Award compensatory and punitive damages;

c.    The Plaintiff demands the foregoing relief jointly and severally against all of the defendants in an amount in excess of the jurisdiction of all lower Courts, except that the punitive damages demands are, as a matter of law, not recoverable against a municipality and therefore are not made against the City;

d.    Declare that the Defendants have violated their obligations under the ADA, Section 504, Section 1983 and the NYSHRL;

e.    Order appropriate injunctive relief against Defendants, including, but not limited to providing wheelchair accessible vehicles and services in connection with the arrest and transport processes, and appropriate policies, training and procedures governing the same;

f.    Award Plaintiff reasonable attorney's fees and costs, and interest pursuant to 42 U.S.C. § 1988; and

g.    Such other and further relief as the court may deem just and proper.

Dated: New York, New York         Respectfully Submitted,
     April 7, 2022

                                     ROTH & ROTH, LLP.

                                     ~//s//~
                                     Elliot Dolby Shields
                                     Co-counsel for Plaintiff
                                     192 Lexington Avenue, Suite 802
                                     New York, New York 10024
                                     (212) 425-1020

                                     Easton Thompson Kasperek Shiffrin LLP
                                     Donald Thompson
                                     Co-counsel for Plaintiff
                                     16 West Main Street, Suite 243
                                     Rochester, New York 14614
                                     Ph: (585) 423-8290